IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-009

Filing Date: February 17, 2011

Docket No. 32,067

STATE OF NEW MEXICO,

   Plaintiff-Appellee,

v.

RAUL LEYVA,

   Defendant-Appellant.

CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS
Stephen Bridgforth, District Judge

Hugh W.  Dangler, Chief Public Defender
Adrianne R. Turner, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Anita Carlson, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

SERNA, Justice.

{1}   The right of the people to be free from unreasonable searches and seizures is protected by both the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution.  While the protections of the Fourth Amendment have been incorporated against the states, under New Mexico's interstitial approach to state constitutional interpretation, the rights provided under the two constitutions are not necessarily coextensive.  In order to receive greater protections that may be conferred by the state constitution, however, a criminal defendant must properly preserve his or her

1

state constitutional argument.

**{2}** Defendant Raul Leyva asserts that his rights under both the United States and New Mexico Constitutions were violated when he was stopped for a traffic law infraction and the questions of the investigating officer were not justified by the initial reason for the stop, and that the district court erred in denying his motion to suppress evidence gathered as a result of the questioning. In *State v. Duran*, we employed a two-part test under the Fourth Amendment for questioning during traffic stops, using the analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968), requiring all questions to be reasonably related to the initial reason for the stop or supported by independent and articulable reasonable suspicion. 2005-NMSC-034, ¶¶ 23, 35, 138 N.M. 414, 120 P.3d 836. This rule is in conflict, however, with three more recent cases from the United States Supreme Court, *Illinois v. Caballes*, 543 U.S. 405 (2005), *Muehler v. Mena*, 544 U.S. 93 (2005), and *Arizona v. Johnson*, ___ U.S. ___, 129 S.Ct. 781 (2009), which together created a temporal bright-line rule under the Fourth Amendment for questioning during traffic stops.

**{3}** We accepted this case on certification from the Court of Appeals to address the continued vitality of the rule we set forth in *Duran* and exercise jurisdiction under NMSA 1978, Section 34-5-14(C)(1) (1972). We hold that, in light of recent United States Supreme Court Fourth Amendment cases, *Duran*'s Fourth Amendment analysis is no longer valid. Analyzing the seizure under the Fourth Amendment, we conclude that Leyva's rights under the Fourth Amendment were not violated. We then review our preservation requirements for rights asserted under the New Mexico Constitution, and find that Leyva preserved his argument under Article II, Section 10. Because Article II, Section 10 provides greater protections against unreasonable searches and seizures than does the Fourth Amendment, we maintain the *Duran* standard for reviewing searches and seizures under the New Mexico Constitution. After considering Leyva's rights under Article II, Section 10, we affirm the Third Judicial District Court's denial of Leyva's motion to suppress.

## I.    BACKGROUND

**{4}** On January 21, 2007, Officer Jeremy Hash of the Mesilla Marshals Department clocked Leyva traveling at a speed in excess of the posted speed limit. Officer Hash activated his emergency lights and Leyva stopped a short way down the road, a distance Officer Hash described as normal due to the road's narrow width at the point where he initiated the stop. Before Leyva stopped, Officer Hash observed Leyva remove one hand from the steering wheel and lean to the right for about ten seconds, with the appearance of "stuffing something under the [passenger] seat," an action the officer found consistent with concealing a weapon or contraband and raising safety concerns. Officer Hash asked for and received Leyva's license, which was reported to be suspended. Following department policy, Officer Hash informed Leyva he could telephone someone to retrieve the car within ten minutes or the car would be impounded. Leyva arranged for someone to pick up the car. Officer Hash did not observe any suspicious activity during the stop, other than Leyva's movement before he pulled over.

2

**{5}**     Officer Hash completed his traffic investigation and issued three citations within approximately ten minutes after the stop was initiated. He then asked Leyva, "Before I turn this vehicle over to anyone else is there anything in it that I need to know about? . . . [Are there] any knives, needles, guns, or drugs[?]" Leyva responded that there was marijuana in the car, and, when asked, consented to a search of the car. Beginning by searching in the area where he had observed Leyva's movement prior to stopping, Officer Hash discovered a tin containing what he suspected to be marijuana underneath the passenger seat; Leyva confirmed that it was marijuana. Continuing to search the passenger compartment of the car, Officer Hash found what he suspected to be, and what later tested positive as, methamphetamine. Leyva was arrested and transported to the police station. He was charged with possession of marijuana, methamphetamine, and drug paraphernalia.

**{6}**     Leyva filed a motion to suppress the evidence discovered as a result of Officer Hash's questioning after the traffic citations had been issued. Leyva argued that the initial stop had been completed when Officer Hash initiated further questioning without justification, constituting an unreasonable seizure under the Fourth Amendment and Article II, Section 10. At the hearing on the motion to suppress, Officer Hash was the only witness. In addition to testifying to the facts set forth above, he testified that in his experience of eight years as an officer, individuals who appeared to be hiding something when a stop was initiated often were discovered to be in possession of contraband. The district court denied the motion to suppress, making the following findings:

1.  Deputy Officer Hash was reasonable in his belief that he observed the Defendant hiding something under the front passenger seat after the deputy activated his emergency equipment.
2.  This action by the Defendant provided sufficient reasonable suspicion of hiding contraband to warrant Deputy Officer Hash to ask if there was anything in the car that he should know about such as contraband.
3.  Deputy Officer Hash only inquired about possible contraband after he had completed the citations and returned all of the Defendant's documents.
4.  The Defendant was not under arrest, and was not going to be arrested, so Miranda does not apply.
5.  The Defendant voluntarily told the Deputy that he had marijuana in his vehicle and allowed the Deputy to search the vehicle.
6.  There was no coercion in the form of the Deputy's question or his conduct.

Leyva subsequently pled guilty to possession of a controlled substance, drug paraphernalia, and marijuana, conditioned upon the right to appeal the denial of his motion to suppress. He appealed to the Court of Appeals, and we accepted certification from that Court.

## II.    ANALYSIS

### A.    The Fourth Amendment

**{7}** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.

### 1.    The effect of recent United States Supreme Court opinions on our Fourth Amendment analysis developed in *Duran.*

**{8}** The Fourth Amendment guarantees the right of the people to be free from unreasonable searches and seizures. *See United States v. Sharpe*, 470 U.S. 675, 682 (1985). In this section we review our most recent pronouncement on the limitations of police questioning during a traffic stop, subsequent cases from the United States Supreme Court, and the effect of those cases on the Fourth Amendment analysis to be employed by the courts of New Mexico.

**{9}** The Fourth Amendment, incorporated against state actors via the Fourteenth Amendment, *see Wolf v. Colorado*, 338 U.S. 25, 28 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 653 (1961), requires that all searches and seizures be reasonable in their execution, *see Terry*, 392 U.S. at 9. The test for whether a search or seizure was reasonable is objective. *See Whren v. United States*, 517 U.S. 806, 814 (1996). "Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam) (internal quotation marks omitted).

**{10}** A law enforcement officer who stops a vehicle to investigate a traffic violation seizes the occupants. *See State v. Funderburg*, 2008-NMSC-026, ¶ 13, 144 N.M. 37, 183 P.3d 922. Although traffic stops often are made when the officer has probable cause to believe that a law has been violated, *see United States v. Shabazz*, 993 F.2d 431, 434-35 (5th Cir. 1993), courts generally analyze traffic stops under *Terry*, because they "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*," *Johnson*, ___ U.S. at ___, 129 S.Ct. at 786 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 n.29 (1984)); *see also Duran*, 2005-NMSC-034, ¶ 23 (stating that New Mexico courts apply the *Terry* analysis to traffic stops). The two-part *Terry* analysis looks at "'[1] whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Duran*, 2005-NMSC-034, ¶ 23 (quoting *Terry*, 392 U.S. at 20). The scope of the investigation may be expanded "'where the officer has reasonable and articulable suspicion that other criminal activity has been or may be afoot.'" *Id.* (quoting *State v. Taylor*, 1999-NMCA-022, ¶ 20, 126 N.M. 569, 973 P.2d 246). Unrelated questions may also be posed where the stop has ended and a consensual encounter has developed. *See, e.g., United States v. Chavira*, 467 F.3d 1286, 1290-91 (10th Cir. 2006)

4

(stating that a traffic stop may become a consensual encounter after the officer has returned the driver's documents and the driver reasonably understands that the stop is over). Where evidence has been obtained as a result of questions not justified under the Fourth Amendment, suppression of that evidence is the proper remedy. *See State v. Rivera*, 2010-NMSC-046, ¶ 28, 148 N.M. 659, 241 P.3d 1099.

**a.**     *State v. Duran*

**{11}**     In *Duran*, we applied the *Terry* analysis to determine when questions posed about travel plans during traffic stops are reasonable under the Fourth Amendment. The defendant was stopped for failure to display a license plate. 2005-NMSC-034, ¶ 3. During the stop, the police officer questioned the defendant and her passenger about their travel plans and made observations leading him to believe drugs were concealed in the car. *Id.* ¶¶ 4-14. After completing the traffic citations, the officer continued to question the defendant and requested consent to search her vehicle, which was granted. *Id.* ¶¶ 14-16. Marijuana was discovered in the gas tank, and the defendant was arrested. *Id.* ¶ 16.

**{12}**     Employing the two-part *Terry* analysis, we framed the question on appeal in *Duran* as whether "a police officer impermissibly expands the scope of the search or seizure beyond the justification for the initial stop by inquiring into a motorist's travel plans or whether such questions are reasonably related to the initial justification for a traffic stop." *Id.* ¶ 26. Reviewing cases from the federal courts of appeal, we noted a split of authority in the reasoning but a "definite consensus that inquiries into a motorist's travel plans are permissible . . . ." *Id.* The Eighth, Ninth, and Tenth Circuits conducted a case-by-case analysis, concluding that questions about travel plans generally were permissible because they are "usually related to the purpose of the stop and further valid governmental law enforcement interests" and because "the intrusion to the public is normally minimal." *Id.* ¶¶ 28-29. In contrast, the Fifth and Seventh Circuits applied a bright-line test, under which, "if the questions asked do not lengthen the stop, the questions are valid." *Id.* ¶ 31.

**{13}**     We adopted the former analysis, relying specifically on *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001), and *United States v. Murillo*, 255 F.3d 1169 (9th Cir. 2001), because "[o]ur case law has consistently disfavored a bight-line test in analyzing Fourth Amendment questions." *Duran*, 2005-NMSC-034, ¶ 34. We rejected the latter approach "because it ignores the scope requirement of the second[] prong of the *Terry* test, which our case law has consistently recognized as appropriate to analyze traffic stops." *Id.* ¶ 33. *Duran* articulated the Fourth Amendment analysis to be applied in our courts:

> [A]ll questions asked by police officers during a traffic stop must be analyzed to ensure they are reasonably related to the initial justification for the stop or are supported by reasonable suspicion. . . . [T]his determination must also include an examination of both the length of the detention and the manner in which it is carried out. The length of the detention should be reasonably limited to the time it takes to complete the underlying justification for the

5

stop. Further, the scope of the questioning should be limited, as well.

*Id.* ¶ 35 (internal quotation marks and citation omitted).

**{14}** Although *Duran* concluded that the Fourth Amendment contained a subject-matter scope limitation, that analysis was not determinative to the Court's holding. *Duran* determined that the questions asked of the defendant and her passenger while the officer was completing the tasks necessary to issue the citations "resulted in no additional delay." *Id.* ¶ 37. The responses to the officer's questions, as well as the officer's observations during the stop, then gave the officer "reasonable suspicion that criminal activity may have been afoot. Thus, [the officer] permissibly expanded the scope of the stop by asking about drugs or large amounts of currency, and then requesting consent to search the vehicle." *Id.* ¶ 38. *Duran* concluded that the district court did not err by denying the suppression motion. *Id.* ¶ 42.

**b.** ***Caballes***, ***Muehler***, **and** ***Johnson*** **overrule** ***Duran*'s subject-matter limitation on questions during traffic stops**.

**{15}** Subsequent to *Duran*, the United States Supreme Court issued three opinions that together adopted the approach to questioning during traffic stops that *Duran* rejected. In 2005, *Caballes* held that a dog sniff, conducted during the time necessary to complete an otherwise lawful stop, revealing no information other than the presence of contraband, did not violate the defendant's Fourth Amendment rights. 543 U.S. at 409. The same term, the Court held in *Muehler* that Fourth Amendment rights are not violated by investigative questioning unrelated to the reason for the initial seizure so long as the questioning does not prolong the length of the detention, as "mere police questioning does not constitute a seizure." 544 U.S. at 100-01 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Neither case cited to *Terry*. More recently, in *Johnson* the Court applied *Terry* and *Muehler* to a traffic stop, during which a passenger was frisked, and held that when the initial stop is lawful and the passenger is not free to leave during the duration of the stop, unrelated questions are permitted so long as they "do not measurably extend" the length of the stop. *Johnson*, ___ U.S. at ___, 129 S.Ct. at 788 (citing *Muehler*, 544 U.S. at 100-01).

**{16}** The cases *Duran* relied upon in rejecting a bright-line approach to police questioning are no longer valid in light of *Caballes*, *Muehler*, and *Johnson*. The Ninth and Tenth Circuits have concluded that *Murillo* and *Holt*, respectively, were overruled by the United States Supreme Court's explicit adoption in *Muehler* of a bright-line analysis in determining limits on the scope of police questioning during a lawful stop. In *United States v. Mendez*, the Ninth Circuit held that the defendant's Fourth Amendment rights were not violated by police questioning that, though unrelated to the initial justification of the stop, did not unnecessarily prolong the length of the stop. 476 F.3d 1077, 1080-81 (9th Cir. 2007). Likewise, in *United States v. Stewart*, the Tenth Circuit concluded that, after *Muehler*, "[t]he correct Fourth Amendment inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions extended the time that a driver was detained, regardless of the

questions' content." 473 F.3d 1265, 1269 (10th Cir. 2007) (internal quotation marks and citations omitted). In *Stewart*, the Tenth Circuit held that a question about weapons in the car was permissible because the question "did not extend the length of the detention." *Id*.

{17} The creation by the United States Supreme Court of a bright-line rule for permissible questioning during traffic stops under the Fourth Amendment is incompatible with the approach we adopted in *Duran*. To the extent that *Duran* rejected the bright-line approach and adopted a case-by-case approach to determine whether police questioning during an otherwise legal traffic stop violates the Fourth Amendment, it is overruled.[1] The proper Fourth Amendment inquiry, as stated by the Tenth Circuit, "'is whether an officer's traffic stop questions extended the time that a driver was detained, regardless of the questions' content.'" *Stewart*, 473 F.3d at 1269 (quoting *Muehler*, 544 U.S. at 101).

c.     **The *Terry* scope analysis considers the reasonableness of the length of the detention during a traffic stop.**

{18} The *Terry* analysis remains applicable to traffic stops. While even members of the United States Supreme Court initially viewed the bright-line rule as effectively discarding the scope requirement of a *Terry* stop, *see Caballes*, 543 U.S. at 421 (Ginsburg, J., dissenting) ("In my view, the Court diminishes the Fourth Amendment's force by abandoning the second *Terry* inquiry (was the police action reasonably related in scope to the circumstances justifying the initial interference)." (internal quotation marks, citation, and brackets omitted)), application of *Caballes*, *Muehler*, and *Johnson* by lower courts underscores that those cases modified, rather than abandoned, the second prong of the *Terry* test. The temporal limitations on *Terry* stops continue to define the limits of the reasonableness of the scope of the investigation. *See United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) ("Under *Terry*'s duration prong, a stop must last no longer than is necessary to effectuate the purpose of the stop." (internal quotation marks, citation, and ellipses omitted)). The questions posed during a traffic stop no longer need to be reasonably related to the initial justification of the stop in order to be permissible under the Fourth Amendment; the length of the stop, however, is limited by the time required to conduct a reasonable investigation into the initial justification for the stop. *See id*. at 488-89; *Shabazz*, 993 F.2d at 438; *State v. Jenkins*, 3 A.3d 806, 828-29 (Conn. 2010).

{19} In sum, after an officer has made a stop based on at least reasonable suspicion of criminal activity, "[a]n officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable

---

[1] The New Mexico Court of Appeals cases *Duran* explicitly characterized as "continu[ing] to be good law[,]" 2005-NMSC-034, ¶ 41, *Taylor*, 1999-NMCA-022, and *City of Albuquerque v. Haywood*, 1998-NMCA-029, 124 N.M. 661, 954 P.2d 93, also are overruled to the extent they are inconsistent with this Opinion.

suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010). Whether a detention becomes unreasonably prolonged depends on "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. "The length of the detention should be reasonably limited to the time it takes to complete the underlying justification for the stop." *Duran*, 2005-NMSC-034, ¶ 35.

**{20}** While the temporal limitations of a *Terry* stop generally require an investigating officer return a driver's documents and permit the driver to depart as soon as the reason for the traffic stop has been completed (unless, of course, the officer has developed reasonable suspicion to conduct an investigation into other criminal activity), most courts have found that a de minimis detention caused by questioning after the completion of the traffic stop is not unreasonable under the Fourth Amendment. This is because reasonableness is the touchstone of any Fourth Amendment analysis. *See Everett*, 601 F.3d at 492; *see also United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) ("Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops."). *But see United States v. Pruitt*, 174 F.3d 1215, 1220-21 (11th Cir. 1999) (finding that the traffic stop should have been completed as soon as the questions related to the initial investigation were completed); 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.3 (4th ed. 2004 & Supp. 2010-11) (noting that because the United States Supreme Court essentially removed the subject matter scope limitation of *Terry* questioning, "that is all the more reason for holding firm on the matter of temporal limits"). The rationale for permitting de minimis extensions of time also is based in *Johnson*'s modification of the *Muehler* Court's "*no* extension" standard to permitting question so long as there is "*no measurable* extension" of the detention. *Accord State v. Morlock*, 218 P.3d 801, 807-08 (Kan. 2009).

**{21}** This Court also has "refuse[d] to draw a bright-line, temporal cut-off point" for an officer's actions during a traffic stop under the Fourth Amendment. *State v. Vandenberg*, 2003-NMSC-030, ¶ 36, 134 N.M. 566, 81 P.3d 19; *see also State v. Neal*, 2007-NMSC-043, ¶ 39, 142 N.M. 176, 164 P.3d 57 (Bosson, J., dissenting) (stating that a de minimis detention to conduct an investigation for reasons unrelated to the initial stop does not violate the Fourth Amendment). Whether an officer's questioning measurably extends the length of a traffic stop remains the proper analysis under the Fourth Amendment. We agree with the Sixth Circuit that a categorical ban on questions that extend the time of a stop is unwarranted because "a police officer intent on asking extraneous questions could easily evade [a bright-line rule] by delegating the standard traffic-stop routine to a backup officer, leaving himself free to conduct unrelated questioning all the while, or simply by learning to write and ask questions at the same time." *Everett*, 601 F.3d at 492.[2]

---

[2]*Everett* distinguished a prior Sixth Circuit case, *United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008), which held that questions asked in the twelve minutes the defendant was

8

**{22}**     Extended detentions caused by questioning unrelated to the initial purpose of the stop continue to violate the Fourth Amendment. *See United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008). To determine whether questioning creates an unreasonable detention, the pertinent inquiry is whether the officer conducted the investigation *diligently*. *See Everett*, 601 F.3d at 492 ("[W]e join our sister circuits in declining to construe *Muehler* and *Johnson* as imposing a categorical ban on suspicionless unrelated questioning that may minimally prolong a traffic stop."). We adopt the Sixth Circuit's articulation of the diligence analysis:

> [B]ecause the touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case. Furthermore, we conclude that it would be inappropriate merely to evaluate the reasonableness of *the interval of prolongation* in isolation. Instead, the proper inquiry is whether the totality of the circumstances surrounding the stop indicates that the duration of *the stop as a whole*–including any prolongation due to suspicionless unrelated questioning–was reasonable.

*Id.* at 493-94 (internal quotation marks and citations omitted).

**d.     Unrelated questions permitted when supported by reasonable suspicion, including for police safety, or during consensual encounter.**

**{23}**     Even if a court determines that questioning unreasonably prolonged the length of the stop, the questioning still may be constitutionally permissible. "An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). Reasonable suspicion must consist of more than an officer's hunch that something is amiss; it requires objectively reasonable indications of criminal activity. *See, e.g.*, *United States v. Washington*, 559 F.3d 573, 576-77 (D.C. Cir. 2009) (finding reasonable suspicion to conduct a protective frisk and car search existed based on the defendant's furtive movement under the car seat, unlikely explanation of the movement, and nervousness in a high crime area). Courts defer to "the training and experience of the officer" when determining whether "particularized and objective indicia of criminal activity" existed. *State v. Van Dang*, 2005-NMSC-033, ¶ 16, 138 N.M. 408, 120 P.3d 830. Suspicion of criminal

---

detained after the traffic investigation was a complete violation of the Fourth Amendment as they were not supported by reasonable suspicion, by stating that the questioning in *Everett* occurred before the stop was completed. 601 F.3d at 492 n.2. We do not find this distinction bars our reliance on *Everett* due to its focus on the fallacies of a non-prolongation rule, and do not find *Urrieta*, which addressed the prolongation of the stop only briefly, to be a more persuasive authority than *Everett* or the other authorities discussed above.

activity need not necessarily be of a specific crime. *See Pack*, 612 F.3d at 355-56 (holding, and compiling cases in support of, the reasonable suspicion required to expand an investigation is that a criminal activity is afoot and that the suspicion need not be directed to a "specific crime requirement").

{24}     Although the scope of a stop may be expanded without violating the Fourth Amendment when an officer has a reasonable suspicion that an individual is armed and dangerous or that other criminal activity is afoot, we underscore that the requirement of reasonable suspicion demands objective and articulable observations that indicate further police action is necessary. This does not mean that an officer must be certain that weapons are present, but rather that "a reasonable, well-trained officer would have made the [same] judgment . . . ." *Vandenberg*, 2003-NMSC-030, ¶ 23 (internal quotation marks and citations omitted). Courts must require articulable facts indicating reasonable suspicion. We find instructive the caution of Judge Richard Posner, describing the testimony of the arresting officer in a suppression hearing:

> Gilding the lily, the officer testified that he was additionally suspicious because when he drove by [the defendant] . . . he noticed that [the defendant] was "staring straight ahead." Had [the defendant] instead glanced around him, the officer would doubtless have testified that [the defendant] seemed nervous or, the preferred term because of its vagueness, "furtive." Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

*United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (original bracket omitted) (holding that reasonable suspicion to stop the defendant existed); *see also Neal*, 2007-NMSC-043, ¶ 31 (rejecting an argument that reasonable suspicion existed when the "circumstances smack more of the type of conjecture and hunch we have rejected in the past as insufficient to constitute reasonable suspicion").

{25}     An officer may conduct a protective search of a stopped vehicle for reasons of officer safety during a traffic stop because "traffic stops are 'especially fraught with danger to police officers.'" *Johnson*, ___ U.S. at ___, 129 S.Ct. at 786 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). A protective search is not a search for evidence. *See Vandenberg*, 2003-NMSC-030, ¶ 33. Such a search must be based upon the objectively reasonable belief that the individuals stopped pose a threat to officer safety, and the search must be limited to its purpose of protecting the officers, and the public, during the stop. *See id.* ¶ 22; *Holt*, 264 F.3d at 1225 ("We emphasize also that the balance does not depend on whether the officer subjectively fears the motorist. Subjective intentions rarely play a role in Fourth Amendment analysis." (footnote omitted)). During traffic stops, movements by the vehicle's occupants, consistent with hiding an object, generally give rise to reasonable safety concerns. *See*, *e.g.*, *United States v. Nash*, 876 F.2d 1359, 1361 (7th Cir. 1989) (finding that

a limited search for weapons in the car was permitted because the officer could reasonably be concerned about his safety after noticing a "furtive gesture" by the defendant as the officer approached and the defendant had a jacket awkwardly arranged over his lap and the floor); *People v. Altman*, 938 P.2d 142, 146-47 (Colo. 1997) (en banc) (finding that the officers acted reasonably in searching the stopped vehicle for weapons after observing the defendant "bend over in his seat and make motions toward the bottom of his seat" and limiting the search to the area near the seat); *State v. Ashbrook*, 586 N.W.2d 503, 508-09 (S.D. 1998) (holding that a protective sweep for weapons of a car during a legitimate traffic stop was permitted when the officer observed the defendant make furtive movements during the time between the activation of the emergency lights and pulling over).[3]

{26}    Questions asked for purposes of ensuring officer safety during a stop generally are proper because "[w]hen these measures are not too intrusive, the government's strong interest in officer safety outweighs the motorist's interests." *Holt*, 264 F.3d at 1221. "Questions directed toward officer safety, therefore, do not bespeak a lack of diligence." *Everett*, 601 F.3d at 495.

{27}    A police officer may also pose questions after the time needed to reasonably conduct the investigation into the initial reason for the stop if the stop has ended and a consensual encounter developed. "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006) (internal quotation marks and citation omitted). If the police officer has reasonably conveyed to the citizen that the stop has ended, any further questioning does not constitute a seizure under the Fourth Amendment. *Id.* (finding that questioning of a passenger who was unaware that the stop of the driver had been terminated was an unreasonable detention and the evidence discovered as a result of those questions must be suppressed).[4]

---

[3]We note, without passing on its propriety, that the Tenth Circuit permits questions about the presence of weapons for reasons of officer safety. *See United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007); *Holt*, 264 F.3d at 1221-22. In *Valenzuela*, after finding the officer's question to the defendant about the presence of weapons in the vehicle "was permissible, if not adviseable[,]" the court held that asking about "other illegal items" likewise was permissible because the inclusion of a few extra words did not "appreciably prolong the length of the stop." 494 F.3d at 890. The *Valenzuela* court applied the same analysis to the request for consent to search, holding that the request for search likewise did not unreasonably delay the stop and thus did not violate the Fourth Amendment. *Id.* at 891, n2.

[4] Leyva was not free to leave *in his car* because his license was suspended; he had to wait until another individual arrived to pick the car up. *See United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (setting forth what is commonly known as the "free to leave"

11

**{28}** Under these rationales, the holdings of cases we have decided under *Duran*, and *Duran* itself, remain valid. The questions posed by the officer in *Duran* either were asked during the time it took to reasonably complete the initial traffic investigation, were a de minimis extension thereof, or were supported by independent reasonable suspicion. 2005-NMSC-034, ¶¶ 37-38; *accord Morlock*, 218 P.3d at 807, 811 (finding questions asked constitutionally permissible because they either occurred during the legitimate stop or were supported by reasonable suspicion). In *Funderburg*, we held that the officer's "minimal detention" of the defendant "based on the presence of reasonable suspicion about the contents of the car, to ask a single question about other criminal activity in the car before asking for consent to search, was reasonable." 2008-NMSC-026, ¶ 33; *see also Van Dang*, 2005-NMSC-033, ¶ 16 ("Because the detention took no longer than necessary and because the officer's questions arose from a reasonable suspicion, we hold that both the duration and scope of the detention were reasonable under the circumstances.").

**{29}** Based on the preceding discussion, our Fourth Amendment analysis requires us to determine whether the contraband and consent questions were asked of Leyva during the time it took to complete the initial lawful investigation. If the questions measurably extended Leyva's detention, Officer Hash was required to have had reasonable suspicion of criminal activity or concern for police safety to support further questioning, or the interaction must have evolved into a consensual encounter.

## 2. Under the Fourth Amendment, the defendant's rights were not violated.

**{30}** We now review the district court's denial of Leyva's motion to suppress, a mixed question of fact and law. *Funderburg*, 2008-NMSC-026, ¶ 10. Typically, this review is a two-step process: we first look for substantial evidence to support the trial court's factual finding, with deference to the district court's review of the testimony and other evidence

---

test). The district court did not address, nor will we, whether this fact meant that Leyva was not free to leave *the scene*, meaning his lawful detention had not yet ended when Officer Hash inquired about weapons or drugs. *Compare Florida v. Bostick*, 501 U.S. 429, 436-37 (1991) (stating that an individual is not seized for Fourth Amendment purposes when police conduct plays no role in that individuals inability to leave the scene); *Chavira*, 467 F.3d at 1291 (holding that the defendant was free to leave, and thus his consent to search was not the product of an unlawful detention, when "path to his vehicle was unobstructed and the trooper was separated from him by the open patrol car door"); *and State v. Snell*, 99 P.3d 191, 195 (Mont. 2004) (applying the *Mendenhall* test under the state constitution to conclude that "a reasonable person would have felt free to leave [the] patrol car" after receiving a ticket and thus the officer's subsequent request for consent to search the car was valid); *with Meghoo v. Commonwealth*, 245 S.W.3d 752, 756 (Ky. 2008) (finding that the required detention of the defendant's truck pursuant to state law "mitigates any claim of unreasonableness as to the length of the detention, since this is not a case in which [the defendant] could have driven away but for the officers' actions").

presented, and we then review de novo the trial court's application of law to the facts to determine whether the search or seizure were reasonable. *Neal*, 2007-NMSC-043, ¶ 15; *Vandenberg*, 2003-NMSC-030, ¶ 17. The burden to show reasonableness is on the State. *State v. Rowell*, 2008-NMSC-041, ¶ 10, 144 N.M. 371, 188 P.3d 95. Our review of a district court's determination of whether reasonable suspicion existed is de novo based on the totality of the circumstances. *Neal*, 2007-NMSC-043, ¶ 19.

**{31}** The first inquiry of the *Terry* analysis, whether the initial stop was lawful, is not at issue in this case, because Leyva does not contest the legality of the initial stop for speeding. Nor does Leyva contest that Officer Hash was authorized to request Leyva's license, registration, and proof of insurance, and have dispatch confirm all were valid. *See Duran*, 2005-NMSC-034, ¶ 24. The focus of our Fourth Amendment inquiry, limited to the second part of the *Terry* analysis, is whether Officer Hash's question about weapons or drugs did not measurably extend the length of the valid stop; that is, whether the questioning exceeded the temporal limitations on the scope of the investigation.

**{32}** The district court found that Officer Hash had completed his investigation into the traffic violation and issued Leyva the citations before inquiring into the presence of contraband in the vehicle. In making this finding, the district court determined that the initial stop had come to an end. Because this is supported by both Officer Hash's testimony at the suppression hearing and the incident report, we defer to the district court's factual finding that the initial investigation was concluded when the officer asked Leyva about the presence of guns and drugs in the car.

**{33}** As discussed above, a de minimis extension of a stop, particularly to ask questions related to officer safety, is not unreasonable under the Fourth Amendment.[5] *See supra* ¶¶ 20-21. Approximately ten minutes passed between the time Leyva came to a stop and Officer Hash returned to Leyva his documents. Posing the subsequent question, "Before I turn this vehicle over to anyone else is there anything in it that I need to know about? . . . [Are there] any knives, needles, guns, or drugs[?]," could not have taken more than ten seconds. It would be nonsensical if we were to hold Officer Hash violated Leyva's Fourth Amendment rights by asking the question *immediately after* handing him the citation, when the questions undoubtedly would have been permitted if Officer Hash had asked while he was writing the citation or running the records check. *See Everett*, 601 F.3d at 492; *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009); *Jenkins*, 3 A.3d at 831-32.

**{34}** Furthermore, officer safety concerns strongly support the reasonableness of Officer Hash's questions. Although Officer Hash had returned Leyva's information and handed him

---

[5]Leyva argues that we should remand to the district court to consider whether the stop was extended, a point the State apparently did not argue below. This is unnecessary because we have access to the full record and we may uphold the district court if it is right for any reason. *See State v. Macias*, 2009-NMSC-028, ¶ 17, 146 N.M. 378, 210 P.3d 804.

the citation, Officer Hash's "need to control the scene," *see Johnson*, ___ U.S. at ___, 129 S.Ct. at 788, had not yet come to an end—the deputy was waiting at the scene until a third party arrived to remove the car Leyva was not permitted to drive, *see Washington*, 559 F.3d at 577 ("[T]he police's concern for safety during a traffic stop ordinarily does not terminate until the officers allow the driver to depart."). Officer Hash reasonably would have been concerned about the possibility of the person retrieving the car accessing a hidden weapon, particularly when the officer was unaware of the identity of the person arriving to retrieve the car. *Cf. Vandenberg*, 2003-NMSC-030, ¶ 36 (finding that a frisk for officer safety conducted after tickets completed, though not yet handed to the defendant, was permissible because the officer had become nervous for his safety during the course of the investigation). The weighty concerns of officer safety that are present in a situation such as this outweigh the minimal intrusion to Leyva of having a single question, in which the word "drugs" was but a small part, asked of him as he awaited a ride.

**{35}** We hold that, under the Fourth Amendment, the question Officer Hash asked Leyva about the presence of weapons or drugs in the car was a permissible de minimis extension of a valid stop posed for reasons of officer safety. After receiving Leyva's answer that drugs were present in the car, Officer Hash had reasonable suspicion to believe contraband was in the car and thus expand his investigation as necessary. *Cf. Vandenberg*, 2003-NMSC-030, ¶¶ 66-67 (Minzner, J., dissenting) (stating that the preferable way for officers to investigate suspicions that arise during traffic stops is incrementally). Leyva's Fourth Amendment rights were not violated and the motion to suppress was properly denied under the Fourth Amendment.

**B.    Preservation Requirements of State Constitutional Argument and Interstitial Analysis**.

**{36}** Having clarified our Fourth Amendment analysis and determined that the district court did not err in denying the suppression motion under the standards of the Fourth Amendment, we now consider *Duran*'s vitality under the New Mexico Constitution. In order for us to address Leyva's rights under the state constitution, however, he must have complied with the preservation requirements of Rule 12-216(A) NMRA. Rule 12-216(A) states: "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked, but formal exceptions are not required . . . ."

> We require parties to assert the legal principle upon which their claims are based and to develop the facts in the trial court primarily for two reasons: (1) to alert the trial court to a claim of error so that it has an opportunity to correct any mistake, and (2) to give the opposing party a fair opportunity to respond and show why the court should rule against the objector.

*State v. Gomez*, 1997-NMSC-006, ¶ 29, 122 N.M. 777, 932 P.2d 1.

**{37}** In his motion to suppress, Leyva cited both the Fourth Amendment and Article II,

14

Section 10, and stated that the New Mexico Constitution provides him with greater protections from unreasonable searches and seizures. Leyva's motion did not cite any cases discussing greater protections provided by Article II, Section 10, nor did he discuss any such cases during the suppression hearing. We now turn to the applicable law to determine whether Leyva preserved his Article II, Section 10 argument.

1.      *State v. Gomez*' requirements for preserving arguments under the New Mexico Constitution.

**{38}**     The preservation requirements effective when Leyva filed his appeal were set forth by this Court in *Gomez* over fourteen years ago. Since that time, *Gomez* often has been construed more strictly than intended. Although it has been suggested that the *Gomez* rule should be altered to encourage development of our state constitutional jurisprudence, *see State v. Garcia*, 2009-NMSC-046, ¶ 56, 147 N.M. 134, 217 P.3d 1032 (Bosson, J., specially concurring); J. Thomas Sullivan, *Developing a State Constitutional Strategy in New Mexico Criminal Prosecutions*, 39 N.M. L. Rev. 407, 420-22 (2009), we conclude that *Gomez*' rule is sound—but that some opinions have strayed by imposing a higher standard, unwarranted by Rule 12-216.

**{39}**     The defendant in *Gomez* filed a motion to suppress evidence found during a car search conducted in the absence of a warrant or exigent circumstances, stating that the search violated his rights under the Fourth Amendment and Article II, Section 10; he cited cases interpreting Article II, Section 10 more expansively than the Fourth Amendment during argument on the motion. 1997-NMSC-006, ¶¶ 3, 10. The Court of Appeals found the defendant did not preserve his state constitutional argument because he "not only failed to articulate why the New Mexico Constitution affords greater protection under these circumstances, but failed to even mention the state constitution." *Id.* ¶ 12. On appeal the defendant argued that "the fundamental goals underlying Rule 12-216 were met because the facts needed for a ruling on the existence of exigent circumstances were developed adequately and the trial court ruled on that issue." *Id.* ¶ 13. The defendant characterized the Court of Appeals' preservation ruling as one that treated the New Mexico Constitution as the "poor cousin" of the federal constitution, and that the preservation requirements should be the same. *Id.*

**{40}**     This Court agreed with the defendant and ruled that his state constitutional argument was preserved. *Id.* ¶ 31. After explicitly adopting the interstitial approach to state constitutional analysis, in which the appellate courts review reasons for departure from the federal standard, *id.* ¶ 20, we set forth the preservation requirements for assignments of error under the state constitution.

> When a litigant asserts protection under a New Mexico Constitutional provision that has a parallel or analogous provision in the United States Constitution, the requirements for preserving the claim for appellate review depend on current New Mexico precedent construing that state constitutional

15

provision. If established precedent construes the provision to provide more protection than its federal counterpart, the claim may be preserved by (1) asserting the constitutional principle that provides the protection sought under the New Mexico Constitution, and (2) showing the factual basis needed for the trial court to rule on the issue. This is no more than is required of litigants asserting a right under the federal constitution, a federal statute, a state statute, or common law. That is, Rule 12-216 requires that litigants "fairly invoke" a ruling by the trial court in order to raise that question on appeal. Assertion of the legal principle and development of the facts are generally the only requirement to assert a claim on appeal.

However, when a party asserts a state constitutional right that has *not* been interpreted differently than its federal analog, a party also must assert *in the trial court* that the state constitutional provision at issue should be interpreted more expansively than the federal counterpart *and* provide reasons for interpreting the state provision differently from the federal provision. This will enable the trial court to tailor proceedings and to effectuate an appropriate ruling on the issue.

*Id.* ¶¶ 22-23 (footnote and headings omitted).[6]

**{41}** *Gomez* concluded that the defendant preserved his claim of error under the state constitution by arguing in his motion to suppress, in which he set forth the facts necessary for a ruling, that his rights were violated under Article II, Section 10, because "[t]here is established New Mexico law interpreting Article II, Section 10 more expansively than the Fourth Amendment." *Id.* ¶¶ 24, 27. In addition, the defendant cited a case discussing exigent circumstances, *id.* ¶ 25, and the district court ruled directly on the issue of the presence of exigent circumstances in denying the motion to suppress, *id.* ¶ 28. *Gomez* held that, although the defendant did not cite cases interpreting Article II, Section 10 more expansively, this "did not operate to prejudice the State in any way" because the district court "is charged with knowing and correctly applying established New Mexico precedent interpreting the state constitution." *Id.* ¶ 30.

Where New Mexico courts have taken a different path than federal courts, our precedent governs regardless of whether a party cites specific cases in support of a constitutional principle, so long as the party has asserted the principle recognized in the cases and has developed the facts adequately to give the opposing party an opportunity to respond and to give the court an

---

[6]If a state constitutional argument has been preserved, the role of the appellate court is to conduct the interstitial analysis if necessary, reviewing the reasons for departure and determining whether departure is warranted under the particular provision. *Id.* ¶ 19 (setting forth examples of reason for departure: "a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics").

opportunity to rule.

*Id.*

**{42}**     *Gomez*' preservation requirements were articulated so that arguments made under the New Mexico Constitution were preserved under Rule 12-216 in the same manner as any other argument; only where a state constitutional provision had never been interpreted to provide greater protection than its federal analog are parties required to alert the trial court and articulate reasons for departure.  The reason for this slightly greater burden flows from our adoption of the interstitial approach:  in order for a court to consider whether the state constitution provides greater protection than the federal constitution, the court must be persuaded that there are reasons to depart from the federal analysis.  Thus, providing the court with reasons for departure is part of trial counsel's duty to present the district court with facts necessary to make a ruling and create a record for appellate review.[7]

**{43}**     Since this Court decided *Gomez*, New Mexico's appellate courts have purported fidelity to its preservation requirements.  *See*, *e.g.*, *Garcia*, 2009-NMSC-046, ¶¶ 10-13; *Montoya v. Ulibarri*, 2007-NMSC-035, ¶¶ 18-19, 142 N.M. 89, 163 P.3d 476; *State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶¶ 11-13, 130 N.M. 386, 25 P.3d 225; *State v. Ochoa*, 2009-NMCA-002, ¶¶ 9-11, 146 N.M. 32, 206 P.3d 143.  At times, however, the discussion of preservation requirements has been blended with the interstitial analysis in a manner that has resulted in the articulation of a preservation standard that exceeds that set forth in and intended by *Gomez*.  *See*, *e.g.*, *State v. Muñoz*, 2008-NMCA-090, ¶ 24, 144 N.M. 350, 187 P.3d 696 (referring to *Gomez*' teaching of "the interstitial approach for preserving state constitutional arguments").  A review of the cases often cited for their discussion of preservation requirements will assist us in distilling the principles of *Gomez*.

**{44}**     In *Cardenas-Alvarez*, we held that the defendant preserved his argument that a border checkpoint stop violated Article II, Section 10. 2001-NMSC-017, ¶¶ 1, 13.  Noting the many cases that had interpreted Article II, Section 10 to provide broader protection than the Fourth Amendment, we found that the defendant "asserted the state constitutional principle that provides the protection he seeks and . . . he provided a factual basis upon which the trial court could rule on the issue."  *Id.* ¶ 12.  Although the defendant did not explicitly cite Article II, Section 10, the argument that the state constitution provided protection against unreasonable searches and seizures, made during closing arguments, was held to be sufficient to satisfy the requirements of Rule 12-216.  *Id.* ¶ 13.  We then concluded that an

---

[7]This Court is not bound by the reasons for departure presented by trial or appellate counsel—whether a state constitutional provision should be interpreted more broadly is a question of law we review de novo. *Cf. Garcia* 2009-NMSC-046, ¶ 57 (Bosson, J., specially concurring) ("In a government of dual sovereigns, it is imperative that our state Constitution develop to its full potential and protect the rights of our citizens where we deem federal law lacking.").

17

"extra layer of protection from unreasonable searches and seizures involving automobiles is a distinct characteristic of New Mexico constitutional law." *Id.* ¶ 15. *Cardenas-Alvarez* correctly applied our teachings from *Gomez*: the defendant alerted the district court to the Article II, Section 10 argument and set forth the facts necessary for the court to rule on that argument, and the appellate court determined that departure from the federal standard was necessary. *Id.*

**{45}** Other cases also have executed *Gomez*' preservation requirements properly. In *Montoya*, this Court found a state constitutional argument had been preserved where the defendant asserted that the applicable state constitutional provision provided greater protection than the federal analog and set forth the facts necessary for the trial court to rule on the issue. 2007-NMSC-035, ¶ 18; *see also State v. Paul T.*, 1999-NMSC-037, ¶¶ 13, 26, 128 N.M. 360, 993 P.2d 74 (finding the state constitutional argument was preserved where the defendant argued that Article II, Section 10 provides greater protection than the Fourth Amendment and provided the factual basis necessary for a ruling because "*Gomez* requires no more"); *State v. Granville*, 2006-NMCA-098, ¶ 14, 140 N.M. 345, 142 P.3d 933 (compiling cases in which Article II, Section 10 has been construed more broadly than the Fourth Amendment and noting that "[the d]efendant need only to have alerted the trial court to the legal issue and to have developed the facts necessary to rule on that issue" in order to preserve his Article II, Section 10 argument).

**{46}** In contrast, some cases have imposed a higher preservation standard. *Duran* did not address Article II, Section 10 because the defendant "did not address how the New Mexico Constitution may afford her greater protection than the federal Constitution . . . ." 2005-NMSC-034, ¶ 22. In *Ochoa*, the Court of Appeals determined the defendant had met the preservation standard because he had asserted that the exact issue of the case (pretextual stops) had not been considered under Article II, Section 10. 2009-NMCA-002, ¶ 9; *see also Funderburg*, 2008-NMSC-026, ¶ 12 (not reviewing the defendant's state constitutional argument on appeal because "[the d]efendant did not argue below, and does not argue to this Court, that the New Mexico Constitution provides any greater protection than the Federal Constitution in the context of this case").

**{47}** Other cases have created exceptions to the preservation requirements. In *Garcia*, this Court excepted the defendant from *Gomez*' preservation requirements because the question of whether the defendant was seized under Article II, Section 10 was raised in the suppression motion but not argued until the State asserted it as a "right for any reason" argument to the Court of Appeals. *Garcia*, 2009-NMSC-046, ¶¶ 7, 12; *see also Rivera*, 2010-NMSC-046, ¶ 14 ("Because [the d]efendant prevailed at the district court level, her citation to the New Mexico Constitution was adequate to preserve the state constitutional claim." (citing *Garcia*, 2009-NMSC-046, ¶ 12)). These cases, though reaching the right result, did so in a way unnecessarily restrictive of *Gomez*' rule.

**{48}** Justice Bosson, in his special concurrence in *Garcia*, drew attention to the higher standard courts were setting for preserving arguments under the state constitution and

18

encouraged a "new look" at the preservation requirements. 2009-NMSC-046, ¶ 56 (Bosson, J., specially concurring). In particular, Justice Bosson highlighted the confusion that has developed in application of *Gomez*' preservation standard when a state constitutional provision has already been interpreted, with courts requiring previous discussion of "the particular claim or principle" rather than the provision. *Id.* ¶¶ 54-55 ("In practical effect, it could require litigants to meet the higher *Gomez* burden each time a new argument or fact pattern under search and seizure is brought before a state court . . . . This is unduly burdensome in the context of search and seizure, and . . . unnecessary."). We agree that the proper inquiry under *Gomez* is whether the *provision* of the state constitution has previously been construed to provide broader protection than its federal counterpart, and disavow any prior statements to the contrary. *See*, *e.g.*, *State v. Ochoa*, 2004-NMSC-023, ¶ 6, 135 N.M. 781, 93 P.3d 1286 ("Thus, we assume without deciding that both constitutions afford equal protection to individuals against unreasonable seizures *in this context*, and we analyze the constitutionality of the seizure under one uniform standard." (emphasis added)). Preserving a state constitutional argument continues to follow the steps set forth in *Gomez*.

## 2. Preservation requirements restated.

**{49}** Rule 12-216 (A)'s preservation requirements are straightforward: "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ." Where a state constitutional *provision* has previously been interpreted more expansively than its federal counterpart, trial counsel must develop the necessary factual base and raise the applicable constitutional provision in trial court. Where the *provision* has never before been addressed under our interstitial analysis, trial counsel additionally must argue that the state constitutional provision should provide greater protection, and suggest reasons as to why, for example, "a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Gomez*, 1997-NMSC-006, ¶ 19.[8]

## 3. The defendant's preservation of his Article II, Section 10 argument.

**{50}** Leyva was required to meet the less stringent of *Gomez*' preservation requirements because "a plethora of precedent already interprets Article II, Section 10 more expansively than the Fourth Amendment." *Garcia*, 2009-NMSC-046, ¶ 52 (Bosson, J., specially concurring). Leyva met this requirement by pleading that his right to be free from an unreasonable search and seizure was violated under both the Fourth Amendment and Article II, Section 10 and developing a factual record in his motion and at the suppression hearing. Leyva's Article II, Section 10 argument was preserved.

---

[8]The exceptions to the preservation requirement contained in Rule 12-216(B) apply to state constitutional arguments as they do to any other. *See Gomez*, 1997-NMSC-006, ¶ 31 n.4 (noting the possibility of appellate courts considering unpreserved state constitutional claims under the exceptions to preservation requirements contained in Rule 12-216(B)).

**4. Interstitial analysis**

**{51}** It is well-established that Article II, Section 10 provides more protection against unreasonable searches and seizures than the Fourth Amendment. *See*, *e.g.*, *Neal*, 2007-NMSC-043, ¶ 16 ("For the past fifteen years, [A]rticle II, [S]ection 10 has been construed to provide broader protections than the Fourth Amendment."); *Cardenas-Alvarez*, 2001-NMSC-017, ¶ 15 ("The extra layer of protection from unreasonable searches and seizures involving automobiles is a distinct characteristic of New Mexico constitutional law"); *State v. Pittman*, 2006-NMCA-006, ¶ 14, 139 N.M. 29, 127 P.3d 1116 ("New Mexico law expresses a strong preference for a warrant."); Sullivan, *supra*, at 427-39 (discussing cases in which this Court and the Court of Appeals have departed from Fourth Amendment analysis in construing Article II, Section 10). As such, we need not be confined by Fourth Amendment law in determining whether Leyva's rights were violated under the New Mexico Constitution. The fact that we have departed from the analysis used to determine whether a violation of the Fourth Amendment occurred in certain contexts, however, does not require us to do so in all contexts. It remains necessary to conduct our de novo review of the law, as "this Court has demonstrated a willingness to undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees." *State v. Gutierrez*, 116 N.M. 431, 440, 863 P.2d 1052, 1061 (1993).

**C.    Article II, Section 10**

**{52}** "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures . . . ." N.M. Const. art. II, § 10.

**1.    *Duran*'s two-prong analysis remains the test for reasonableness of police questioning during traffic stops under Article II, Section 10**.

**{53}** We have consistently said that "'Article II, Section 10 expresses the fundamental notion that every person in this state is entitled to be free from unwarranted governmental intrusions,' and thus identified a broader protection to individual privacy under the New Mexico Constitution" than under the Fourth Amendment. *Garcia*, 2009-NMSC-046, ¶ 29 (quoting *Gutierrez*, 116 N.M. at 444, 863 P.2d at 1065). "Article II, Section 10 is calibrated slightly differently than the Fourth Amendment. It is a foundation of both personal privacy and the integrity of the criminal justice system, as well as the ultimate regulator of police conduct." *Id.* ¶ 31. As in *Garcia*, in this case we primarily are concerned with regulating police conduct. *See id.* ¶ 26. We must now determine whether the Fourth Amendment's bright-line rule or *Duran*'s case-by-case analysis is better calibrated to protect the rights of individuals on New Mexico's roadways from unwarranted police intrusions under the New Mexico Constitution.

**{54}** "New Mexico courts have consistently rejected federal bright-line rules in favor of an examination into the reasonableness of officers' actions under the circumstances of each case." *Ochoa*, 2009-NMCA-002, ¶ 24. This opposition to bright-line rules greatly

20

influenced our adoption in *Duran* of a two-part test, tracking the *Terry* analysis, to questions during traffic stops. *See supra* ¶¶ 13-14. *Duran* rejected the approach later adopted by the United States Supreme Court in *Caballes*, *Muehler*, and *Johnson* because "[w]e have continually used a fact-based, case-by-case approach to determine what questions are reasonably related to the initial justification for the stop and whether an officer had reasonable suspicion to expand the scope of his or her search or seizure during an investigatory stop." 2005-NMSC-034, ¶ 34. Since *Duran* was decided, our cases construing Article II, Section 10 have persisted in rejecting bright-line rules. *See*, *e.g.*, *Rivera*, 2010-NMSC-046, ¶ 23 (declining to adopt the Fourth Amendment private search doctrine under Article II, Section 10 due to our constitution's "strong preference for a warrant"); *Garcia*, 2009-NMSC-046, ¶ 37 (retaining the totality of the circumstances free-to-leave test for seizures under Article II, Section 10); *Rowell*, 2008-NMSC-041, ¶ 20 (rejecting a bright-line rule for car searches incident to arrest in favor of a case-by-case approach); *State v. Bomboy*, 2008-NMSC-029, ¶¶ 5, 8, 144 N.M. 151, 184 P.3d 1045 ("applying the fact-specific reasonableness inquiry" rather than the bright-line rule sanctioned under the Fourth Amendment).

**{55}**  *Duran's* analysis, requiring a reasonable justification for the initial stop and that all questions asked during the stop be reasonably related to the reason for the stop or otherwise supported by reasonable suspicion, *see supra* ¶ 13, ensures that investigating officers do not engage in "fishing expeditions" during traffic stops. *See Neal*, 2007-NMSC-043, ¶ 28. This approach comports better with the broader protections provided under Article II, Section 10, which we have determined are best analyzed under a case-by-case approach rather than bright-line temporal tests developed under the Fourth Amendment. We conclude that *Duran*'s two-part analysis, adhering to the scope and duration requirements set forth in *Terry*, best protects the right against unreasonable searches and seizures under Article II, Section 10 of the New Mexico Constitution. Article II, Section 10 requires that all questions asked during the investigation of a traffic stop be reasonably related to the initial reason for the stop. Unrelated questions are permissible when supported by independent reasonable suspicion, for reasons of officer safety, or if the interaction has developed into a consensual encounter. *See Duran*, 2005-NMSC-034, ¶ 35. The overall reasonableness of the stop continues to be "determined by balancing the public interest in the enforcement of traffic laws against an individual's right to liberty, privacy, and freedom from arbitrary police interference." *Id.* ¶ 22 (citing *Mimms*, 434 U.S. at 109).

**{56}**  While our rejection of the Supreme Court's bright-line rule for traffic stop questioning is firmly rooted in Article II, Section 10, we note that the rule has come under criticism from scholars and courts alike. Professor LaFave, discussing the bright-line rule later adopted, called it "dead wrong[,]" and

> totally at odds with the *Terry* line of Supreme Court decisions on the limits applicable to temporary detentions, and amount[s] to nothing more than an encouragement to police to engage in pretextual traffic stops so that they may engage in interrogation about drugs in a custodial setting

(albeit not custodial enough to bring even the protections of *Miranda* into play). The correct rule is that followed by some other courts: that in strict accordance with *Terry* and its progeny, questioning during a traffic stop must be limited to the purpose of the traffic stop and thus may not be extended to the subject of drugs.

Wayne R. LaFave, *The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1887 (2004) (footnotes omitted); *see also State v. Washington*, 898 N.E. 2d 1200, 1205-06 (Ind. 2008) (applying a distinct analysis to a state constitutional claim after determining that questions asked of a driver about contraband did not violate the Fourth Amendment pursuant to *Muehler* because "[t]he Indiana Constitution may protect searches that the federal Constitution does not"); *Brown v. State*, 182 P.3d 624, 626 (Alaska Ct. App. 2008) (interpreting the search and seizure protections provided by the state constitution as more protective than the Fourth Amendment because "the Fourth Amendment rules governing traffic stops create the potential risk that law enforcement officers will compromise the privacy of many citizens"); *cf. Jenkins*, 3 A.3d at 852 (holding that protections provided under the Connecticut constitution are coextensive with those provided by the Fourth Amendment because "[o]ur own constitutional language, precedents and history do not support a ready departure from the federal case law in this area, particularly because the recent United States Supreme Court decisions do not represent a sea change from prior Connecticut precedent").

## 2. Under Article II, Section 10, the defendant's rights were not violated.

**{57}**   Our final task in this Opinion is to determine whether Leyva was subjected to an unreasonable search and seizure under Article II, Section 10. The standard of review for motions to suppress is the same under Article II, Section 10 as it is for the Fourth Amendment. *See supra* ¶ 30.

**{58}**   As under the Fourth Amendment analysis, we need not discuss whether Officer Hash's initial stop of Leyva was reasonable, as Leyva concedes this point. We may proceed directly to determine whether the questions relating to contraband and for consent to search were reasonably related to the initial reason for the stop, or if they were permitted otherwise. The district court did not make an explicit ruling on whether the questions were permissible under the second *Duran* prong, but concluded that Officer Hash had independent reasonable suspicion to ask the question about contraband. In doing so, the district court implicitly ruled that questioning Leyva about the presence of weapons or drugs in the car was not reasonably related to the initial speeding stop, or to the discovery that Leyva was driving without proof of insurance, and we will not disturb this conclusion.

**{59}**   Because the questions were not permitted under the *Duran* test as reasonably related to the initial stop, we must determine whether the district court properly concluded that Officer Hash possessed independent and articulable reasonable suspicion to expand his questioning of Leyva. A law enforcement officer must have "reasonable and articulable

suspicion that other criminal activity has been or may be afoot" in order to expand an investigation. *Neal*, 2007-NMSC-043, ¶ 20 (quoting *State v. Williamson*, 2000-NMCA-068, ¶ 8, 129 N.M. 387, 9 P.3d 70); *see also supra* ¶¶ 23-24. Reasonable suspicion is measured by an objective standard based on the totality of the circumstances. *Neal*, 2007-NMSC-043, ¶ 21.

**{60}** The district court found that Officer Hash possessed reasonable independent suspicion that Leyva was engaged in illegal activity based on Leyva's furtive movements in the car—appearing to hide something under the passenger seat—before stopping. The district court's conclusion is supported by the incident report and the deputy's testimony, giving weight to Officer Hash's eight years of experience and training as a law enforcement officer, *see Van Dang*, 2005-NMSC-033, ¶ 16 (discussing importance of officer training and experience to forming reasonable suspicion of criminal activity), and considerations of officer safety, *see Johnson*, ___ U.S. at ___, 129 S.Ct. at 786 (stating that "legitimate and weighty interest in officer safety" outweighs additional minor intrusions (internal quotation marks and citation omitted)). In contrast, in *Paul T.*, we found that the circumstances of the seizure, viewed objectively, did not "rise to a level necessitating a full search analogous to a search incident to arrest" under Article II, Section 10. 1999-NMSC-037, ¶ 14. In that case, the defendant was taken into custody for a curfew violation and none of the circumstances indicated that the officer reasonably was concerned about his safety in transporting the youth. *Id.* We also concluded that the need to preserve evidence did not justify a search where the crime was curfew violation. *Id.* ¶ 15.

**{61}** Based on the totality of the circumstances, we cannot say that it was unreasonable for Officer Hash to inquire into the presence of weapons or other contraband in the vehicle. Officer Hash was intending to permit an unknown third party to remove the vehicle from the premises and Officer Hash possessed a reasonable suspicion that Leyva had hid an item in the car.[9] Based on the facts presented in this case we conclude that the State met its burden of showing that Officer Hash's questioning was not unreasonable under Article II, Section 10. Officer Hash was justified in asking Leyva about weapons and other contraband in the

---

[9]While the State argues that Leyva's failure to immediately pull over is a factor contributing to Officer Hash's development of reasonable suspicion, Officer Hash's testimony and report indicate that this activity was entirely normal for the road and thus should not be given weight. Even if Officer Hash himself had not discredited any attempt to include Leyva's delay in pulling over after the emergency lights had been activated, we would not find this factor especially weighty in the reasonable suspicion analysis. *See*, *e.g.*, *United States v. Jenson*, 462 F.3d 399, 405-06 (5th Cir. 2006) (giving "great respect" to the arresting officer's testimony that, in his experience, it was unusual for the defendant's car not to come to an immediate stop but finding that "thirty seconds to a minute was a reasonable amount of time for [the defendant] to respond to the flashing of the emergency lights" and in itself could not support reasonable suspicion that the defendant possessed contraband).

23

vehicle, and the response to this question gave him further justification to expand his search by asking for consent to search the vehicle. Leyva's argument that his consent was tainted by an unreasonable seizure fails.

## III.    CONCLUSION

**{62}**    *Duran*'s subject matter and duration *Terry* analysis for questioning during traffic stops is no longer valid under the Fourth Amendment, but is retained for analysis under Article II, Section 10 of the New Mexico Constitution. Leyva's Fourth Amendment rights were not violated by police questioning that occurred after the traffic investigation was completed because the questions were a de minimis extension of the detention and reasonable under the circumstances. Leyva preserved his Article II, Section 10 argument, and the State carried its burden to show that questions asked after the traffic stop had been concluded were not unreasonable under the New Mexico Constitution. The district court's order denying the motion to suppress is affirmed.

**{63}    IT IS SO ORDERED**.

_____
**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Leyva*, Docket No. 32,067**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-PA | Preservation of Issues for Appeal |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |
| CT-IT | Interstitial Analysis |
| CT-NM | New Mexico Constitution, General |

CT-SU        Suppression of Evidence

**CA**        **CRIMINAL PROCEDURE**
CA-CN        Consent
CA-MR        Motion to Suppress
CA-RS        Reasonable Suspicion
CA-SZ        Search and Seizure
CA-WS        Warrantless Search