**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2020-NMSC-005**

**Filing Date: January 2, 2020**

**No. S-1-SC-36516**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**MIKEL A. MARTINEZ,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Fred T. Van Soelen, District Judge**

Released for Publication February 18, 2020.

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
MJ Edge, Assistant Appellate Defender
Santa Fe, NM

for Respondent

**OPINION**

**NAKAMURA, Chief Justice.**

**{1}** Defendant Mikel Martinez moved to suppress all evidence obtained as the fruits of a *Terry* stop that he alleges was unlawful and led to the discovery that he possessed drugs and drug paraphernalia. The district court determined that the stop was lawful as it was predicated on reasonable, articulable suspicion. The Court of Appeals reversed and held that the officer's suspicion amounted to nothing more than an "unparticularized hunch." *State v. Martinez*, No. 35,402, mem. op. ¶¶ 1, 15 (N.M. Ct. App. June 5, 2017) (non-precedential). This case requires us to evaluate what, precisely, the difference is

between reasonable, articulable suspicion of criminality and a mere hunch. We conclude that the officer who stopped Martinez was not operating upon a hunch but had "a particularized and objective basis" to suspect that Martinez was engaged in criminal activity. *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation marks and citation omitted). We affirm the district court. The Court of Appeals is reversed.

## I.    BACKGROUND

{2}    Martinez's charges included drug trafficking and possession. Prior to trial, he moved to suppress all evidence the State had to support these charges. At the suppression hearing on the motion, New Mexico State Police Officer Donald Garrison provided the following testimony.

{3}    At the time of the hearing, Officer Garrison had been with the New Mexico State Police for twenty years and had significant training and experience in narcotics investigations. On the date he encountered Martinez, Officer Garrison was conducting surveillance of an Allsup's gas station and convenience store, a location at which he knew drugs were purchased and sold with frequency. He had personally purchased drugs at the Allsup's in an undercover capacity "probably 15 to 20 times," and used confidential informants to make "[a]nother probably 20, 30" drug purchases there.

{4}    While watching the Allsup's, he saw two men—later identified as Martinez and Don Crespin—drive up to one of the gas pumps at the Allsup's. Martinez was driving. Crespin exited the vehicle, started the gas pump, and then got back in. Martinez also exited and walked towards the convenience store. Before entering the store, he passed a large man. After passing Martinez, the large man walked to Martinez's vehicle; got in the left, rear seat; interacted with Crespin for about two to three minutes; and then exited the vehicle. Martinez left the store and returned to the vehicle. Officer Garrison believed he had just witnessed a "possible narcotics transaction."

{5}    Martinez then drove to the side of the Allsup's and parked. After "a few minutes," an SUV appeared and parked next to Martinez and Crespin. A woman exited the SUV; entered Martinez's vehicle again on the left, rear side; stayed in the vehicle for a few minutes; exited; and then reentered the SUV, which drove away. Officer Garrison suspected he had just witnessed a second "illegal narcotics transaction."

{6}    Officer Garrison decided to investigate to determine "exactly what was going on." He suspected that Martinez and Crespin were engaged in drug sales, but was "open-minded" and wanted to see if they had "a legitimate reason" for their activity. When asked why he suspected Martinez and Crespin were engaged in drug sales, Officer Garrison explained that "I've done them before, personally done [them], go in and sit inside [the] back of [the] vehicle, right front passenger side, somewhere inside a vehicle, do the drug transaction, and then exit the vehicle. It's just—it was consistent with what I've done and seen."

**{7}** Officer Garrison pulled his car behind Martinez and Crespin's vehicle, activated his emergency equipment, and made contact with the men. The remainder of the events are established by evidence in the record other than Officer Garrison's testimony.

**{8}** Crespin would not, despite Officer Garrison's request, keep his hands on the dashboard while they spoke, so Officer Garrison directed Crespin to exit the vehicle and then put him in handcuffs. After Crespin was handcuffed, Officer Garrison discovered a clear, plastic bag containing a white powdery substance he was sure was methamphetamine near the right, rear tire of the vehicle. Martinez was then also detained.

**{9}** Martinez and Crespin denied throwing the methamphetamine on the ground. Officer Garrison then asked for their consent to search the vehicle. His request was denied, so Officer Garrison summoned a K-9 unit and the dog alerted on the right, rear side of the vehicle. Officer Garrison informed the men that he would obtain a warrant to search the vehicle and that they were free to leave but that the vehicle would remain with him. Once the search warrant was obtained, methamphetamine, marijuana, a scale, cash, and other drug paraphernalia were discovered inside the vehicle.

**{10}** In his suppression motion, Martinez argued that Officer Garrison did not have reasonable suspicion "at the inception of the seizure" and, therefore, the seizure was unlawful and any fruits of that seizure must be suppressed. Martinez specifically asserted that Officer Garrison's suspicion that he was engaged in drug transactions "did not amount to anything more than an inarticulate hunch that falls short of the reasonable, articulable, and particularized suspicion required to justify a seizure." The district court rejected Martinez's arguments.

**{11}** The court found that Officer Garrison had knowledge that the Allsup's was a place where drugs were sold and saw Martinez undertake precisely the type of conduct in which those selling drugs engage. Officer Garrison's training, experience, and observations produced, in the court's view, far more than a mere "hunch." He had, the court concluded, reasonable, articulable suspicion of possible criminality to perform a *Terry* stop. We think it worthwhile to reproduce the district court's own words.

> [Y]ou have the suspicious behavior of the car pulling up to a pump, two people in the vehicle, one goes in the store while the other one pumps. While they're pumping, a male approaches the vehicle . . . .
>
> . . . .
>
> So you go and you sit in the car for two or three minutes, get out, then the car—the people get back in the car, they take off from there. Do they leave? No, they pull to the south side of the same building, sit there four or five minutes without getting out, which I think it is key here, until another vehicle pulls up next to them and basically the same thing

happens. A person gets out, gets into the vehicle for a few minutes, gets back out, and takes off.

I think the training and experience of the officers says that is a drug transaction that's going on . . . .

. . . .

The fact that the observance—or the behavior displayed by the people in the vehicle took place in a high drug trafficking area is important.

And so I think the officer[] did have reasonable suspicion to stop the vehicle.

**{12}** Martinez proceeded to trial and was convicted and sentenced. He appealed and challenged the district court's denial of his suppression motion. The Court of Appeals reversed and held that Officer Garrison's knowledge and experience about drug sales at the Allsup's gave rise to nothing more than an "unparticularized hunch" and, therefore, "it was not reasonable for Officer Garrison to conclude that [Martinez] was involved in drug transactions." *Martinez*, No. 35,402, mem. op. ¶¶ 1, 15. In reaching this conclusion, the Court of Appeals relied heavily on *State v. Neal*, 2007-NMSC-043, 142 N.M. 176, 164 P.3d 57, which the Court described as "instructive" and "controlling." *Martinez*, No. 35,402, mem. op. ¶¶ 11-14, 18.

**{13}** The State filed a petition for a writ of certiorari. We granted the petition and have jurisdiction over the State's appeal. *See* N.M. Const. art. VI, § 3; NMSA 1978, § 34-5-14(B) (1972).

## II. DISCUSSION

**{14}** "The legality of a search questioned in a suppression hearing is generally tested as a mixed question of law and fact . . . ." *Neal*, 2007-NMSC-043, ¶ 15 (internal quotation marks and citation omitted). This standard involves two separate lines of inquiry and is, therefore, spoken of as involving "a two-step process[.]" *State v. Leyva*, 2011-NMSC-009, ¶ 30, 149 N.M. 435, 250 P.3d 861.

**{15}** The first inquiry or step concerns the facts. The trial court is responsible for determining "the historical facts that animate the transaction to be evaluated." *State v. Attaway*, 1994-NMSC-011, ¶ 5, 117 N.M. 141, 870 P.2d 103. The court "performs this fact-finding role by reciting events and assessing the credibility of the testimony offered[,]" and is given "wide latitude in determining that an historical fact has been proven." *Id.* We review these "purely factual assessments" only "to determine if the fact-finder's [findings are] supported in the record by substantial evidence." *Id.* "Factfinding frequently involves selecting which inferences to draw." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted). And because it is the district court's responsibility to select the factual

inferences that shall govern, "all reasonable inferences in support of the [trial] court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *State v. Lopez*, 2005-NMSC-018, ¶ 9, 138 N.M. 9, 116 P.3d 80 (internal quotation marks and citation omitted).

**{16}** The second inquiry involves the law. This Court sits as final arbiter of what the law is and how it applies to any given set of facts. *Reed v. State ex rel. Ortiz*, 1997-NMSC-055, ¶ 47, 124 N.M. 129, 947 P.2d 86, *rev'd on other grounds*, 524 U.S. 151 (1998). Whether police conduct is objectively reasonable is a legal question that is necessarily "fact-based" and "compels a careful balancing of constitutional values[.]" *State v. Rowell*, 2008-NMSC-041, ¶ 8, 144 N.M. 371, 188 P.3d 95. Yet, "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." *Ornelas*, 517 U.S. at 694. Thus, we must define this inherently elusive concept and give it shape and content through the adjudication of cases; to put the point in slightly different terms: it is our constitutional responsibility "to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context . . . ." *State v. Vandenberg*, 2003-NMSC-030, ¶ 19, 134 N.M. 566, 81 P.3d 19 (internal quotation marks and citations omitted). The ultimate aim of this second line of inquiry is to decide the constitutional reasonableness of the police conduct. *See Leyva*, 2011-NMSC-009, ¶ 9. In making that determination "we review the totality of the circumstances as a matter of law." *See State v. Van Dang*, 2005-NMSC-033, ¶ 14, 138 N.M. 408, 120 P.3d 830.

**{17}** The "historical facts" in this case are not disputed. No one denies that Officer Garrison saw Martinez arrive at the Allsup's and engage in the conduct Officer Garrison observed and recounted at the suppression hearing. The question before us is the legal significance of those facts. *See Vandenberg*, 2003-NMSC-030, ¶ 19. More specifically, the purely legal question we must answer is whether the evidence available to Officer Garrison was sufficient to justify the *Terry* stop he performed.

**{18}** We have interpreted Article II, Section 10 of the New Mexico Constitution to provide, in some contexts, broader protections against unreasonable searches and seizures than the Fourth Amendment. *State v. Yazzie*, 2016-NMSC-026, ¶ 38, 376 P.3d 858. But, "we have never interpreted the New Mexico Constitution to require more than a reasonable suspicion that the law is being or has been broken to conduct a temporary, investigatory traffic stop[.]" *Id.* We apply the same reasonable suspicion standard when conducting both Fourth Amendment and Article II, Section 10 analyses. *Id.*

## A. Reasonable Suspicion

**{19}** As we noted earlier, it is not possible to articulate with any precision what reasonable suspicion means. *Ornelas*, 517 U.S. at 694-95. For this reason, no "simple shorthand verbal formula" exists to measure the validity of a *Terry* stop. *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.5(a) at 644-45 (5th ed. 2012) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Courts

have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person." *Cortez*, 449 U.S. at 417. "[T]he essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." *Id.* "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417-18; *accord State v. Werner*, 1994-NMSC-025, ¶ 11, 117 N.M. 315, 871 P.2d 971.

{20}    Here, Officer Garrison's assessment that he had reasonable suspicion to temporarily stop and question Martinez was informed by (1) Officer Garrison's training and experience with drug investigations; (2) the conduct in which Martinez engaged at the Allsup's which in turn caused Officer Garrison to infer that Martinez was involved in drug transactions; and (3) the fact that the Allsup's is a high-crime area where drug sales frequently occur. We discuss each of these considerations in turn and describe how they factor into the reasonable suspicion analysis in this case.

## 1.    Training and experience

{21}    Although the method to test the ultimate validity of a *Terry* stop is objective, officers must necessarily rely upon their subjective judgment to determine if observed conduct suggests criminality. *See* La Fave, *supra*, § 9.5(a) at 648. This makes their work difficult. The police must "translate the law's abstractions into actual practice in the unpredictable circumstances of the streets." *United States v. Johnson*, 599 F.3d 339, 342-43 (4th Cir. 2010). "This is at once a vital and a difficult mission. It is vital because errors in either direction—toward excessive intrusion or toward impotent enforcement—can be costly. It is difficult because the contexts are varying and, quite often, the time for deciding is short." *Id.* Training and experience ensure officers avoid the bookend evils of excessive intrusion and impotent enforcement.

{22}    When an officer relies upon training and experience to effectuate a stop, it is necessary that the officer "explain *why* [their] knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." *United States v. Johnson*, 171 F.3d 601, 604 (8th Cir. 1999) (citing *Cortez*, 449 U.S. at 418-22). Or, as was said in *Terry v. Ohio*, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." 392 U.S. 1, 21 (1968).

{23}    There is, of course, always risk that even trained and experienced officers may err. But the simple truism that human judgment sometimes fails in no way undermines the value of training and experience and the unique perspective this provides law enforcement officers. Training and experience ensure that officers "are uniquely capable both of recognizing [the] signatures [of criminality], and by the same token, of not reading suspicion into perfectly innocent and natural acts." *Johnson*, 599 F.3d at 343. "[E]xperience leads not just to proper action but to prudent restraint." *Id.* In sum, "[r]easonable suspicion engages probabilities." *Yazzie*, 2016-NMSC-026, ¶ 33.

"[P]robability in turn is best assessed when one has encountered variations on a given scenario many times before." *Johnson*, 599 F.3d at 343.

**{24}** Officer Garrison's experience led him to anticipate that he might see drug transactions at the Allsup's. Indeed, the evidence suggests that he was engaged in surveillance at the Allsup's because there was a strong likelihood a drug transaction would be detected. His anticipation was not speculative. He knew drugs had been bought and sold at the Allsup's many times before.

**{25}** Officer Garrison then observed Martinez partake in two instances of exactly the kind of drug activity Officer Garrison had previously observed at the Allsup's. Again, Officer Garrison was not speculating when he formed suspicion that Martinez might be selling drugs. His suspicion was grounded upon specific facts and rational inferences from those facts.

**{26}** The Court of Appeals was unpersuaded that Officer Garrison could permissibly deduce, based on his "specialized training," that Martinez was engaged in potential criminality. *See Martinez*, No.35,402, mem. op. ¶ 15 ("Officer Garrison did not point to any individualized behavior or any specific articulable facts . . . that could support a finding of reasonable suspicion that [Martinez] was involved in the purchase or sale of illegal narcotics."). From the Court of Appeals' perspective, what Officer Garrison observed amounted to nothing more than "otherwise innocent conduct," and those observations could not justify a *Terry* stop for which reasonable suspicion was required. *Id.* ¶ 14. This view diverges from the perspective of the facts we are required to embrace as a matter of law.

**{27}** The view of the facts that controls here is that which is most favorable to the decision reached by the district court. *Lopez*, 2005-NMSC-018, ¶ 9. Moreover, courts must "defer to the training and experience of the officer when determining whether particularized and objective indicia of criminal activity existed." *Leyva*, 2011-NMSC-009, ¶ 23 (internal quotation marks and citation omitted); *see also United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997) ("[D]eference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions."). The district court paid appropriate deference to Officer Garrison, his training, and the judgments he formed given his background and training. The Court of Appeals erred in discounting the gloss the district court gave the facts here. It was this error that prompted the Court of Appeals to determine, wrongly, that Officer Garrison provided no individualized or specific facts to justify his suspicion and his decision to perform the stop.

## 2.     Permissible inferences versus hunches

**{28}** It cannot be, as a simple matter of logic, that an officer may stop and briefly investigate the possibility of criminal conduct only if the officer is certain of the existence of criminal conduct. If certainty of wrongdoing were the standard, there would never be reason for investigation.

**{29}** If officers need not be certain that observed conduct is criminal in order to stop a person and investigate, then what amount of suspicion must an officer possess to execute a valid *Terry* stop? Our case law makes clear that "[u]nsupported intuition and inarticulate hunches are not sufficient." *Jason L.*, 2000-NMSC-018, ¶ 20 (internal quotation marks and citation omitted). But where does the impermissible "hunch" end and the informed and permissible inference begin? We must attempt some answer to this question.

**{30}** "The level of suspicion required for an investigatory stop is considerably less than proof of wrongdoing by a preponderance of the evidence." *State v. Urioste*, 2002-NMSC-023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (internal quotation marks and citation omitted). Officers are "not required to rule out all possibility of innocent behavior before initiating a brief stop and request for identification. The test is founded suspicion, not probable cause." *United States v. Holland*, 510 F.2d 453, 455 (9th Cir. 1975); *accord Yazzie*, 2016-NMSC-026, ¶ 18. "[P]olice officers must be permitted to act before their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent." *Holland*, 510 F.2d at 455.

**{31}** "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." *In re Tony C.*, 582 P.2d 957, 960 (Cal. 1978); *accord Yazzie*, 2016-NMSC-026, ¶ 22. This is because the principal function of an investigation is to resolve whether certain activity is in fact legal or illegal. *In re Tony C.*, 582 P.2d at 960; *accord United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007). "[I]t will suffice that there exists at the time of the stop a substantial possibility . . . that criminal conduct has occurred, is occurring, or is about to occur." LaFave, *supra*, § 9.5(b) at 658-59 (footnotes and internal quotation marks omitted).

**{32}** The argument that the conduct under scrutiny is equally consistent with innocence—an argument Martinez makes here in support of the Court of Appeals' resolution of this case—can prevail only where there are no facts that would "make the conduct observed . . . anything but innocuous." *United States v. Torres-Urena*, 513 F.2d 540, 542 (9th Cir. 1975). In other words, where there is not even "a significant possibility . . . that the person observed is engaged in criminal conduct." LaFave, *supra*, § 9.5(b) at 663.

**{33}** Officer Garrison most certainly could infer that there was a substantial possibility Martinez was engaged in drug sales. Officer Garrison observed two instances of conduct consistent with drug transactions. The Court of Appeals' conclusion that Officer Garrison's deductions and inferences amounted to nothing more than an "unparticularized hunch" of wrongdoing overstates what is necessary for an officer to form particularized suspicion. *Martinez*, No. 35,402, mem. op. ¶ 15. Similarly, the Court's conclusions are predicated on a view of the evidence not consistent with the district court's findings.

**{34}** In sum, while it was possible Martinez's conduct was innocuous, Officer Garrison was not required to wait until he was certain Martinez's conduct was criminal before investigating. Officer Garrison was permitted to investigate to resolve whether in fact Martinez's conduct was innocent or criminal.

### 3. High-crime areas

**{35}** Generally speaking, arguments in the Fourth Amendment context predicated upon allegations that conduct was observed in a "high-crime area" should be received with "circumspection." LaFave, *supra*, § 9.5(g) at 745 (citing Andrew Guthrie Ferguson and Damien Bernache, *The "High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am. U.L. Rev. 1587, 1593 (2008)). Although circumspection is the appropriate stance as a general matter, not all high-crime-area arguments are made equally.

**{36}** These arguments generally come in two types. *Id.* at 744-45. The first involves entirely "unspecific" assertions about what type of crimes purportedly occur in the high-crime area and how those crimes rendered a defendant's conduct "suspicious." *Id.* at 745 n.363 (collecting cases). This form of high-crime-area argument rightly gains little or no traction. But, where an officer is patrolling an area known as a site where a particular type of crime is prevalent and stops an individual on suspicion that he or she has potentially committed the very crime that occurs with frequency in that area, then the assertion that the area in question is a high-crime area is quite acceptable if not essential to understanding and judging the merits of the officer's suspicion. *See, e.g.*, *United States v. Whitfield*, 634 F.3d 741, 743-46 (3d Cir. 2010) (affirming the district court's finding of reasonable suspicion where the suspect engaged in a "closed fist hand-to-hand exchange" in an area known for drug activity). This second form of high-crime-area argument is logical and acceptable.

**{37}** We are not confronted here with generic allegations concerning some crime-ridden location as justification for stopping an individual engaged in some undefined, suspicious activity. Rather, Officer Garrison's testimony was that the Allsup's is a location where a particular type of crime, drug transactions, is committed with frequency and he suspected Martinez of engaging in precisely that type of crime, i.e., drug sales. The fact that the Allsup's is a drug hot spot was essential to making sense of Officer Garrison's testimony and actions. It was not testimony to be dismissed or treated with undue circumspection.

### 4. Conclusion: reasonable suspicion

**{38}** Officer Garrison observed Martinez take part in what Officer Garrison believed—based on his training, experience, and familiarity with the Allsup's—were two drug sales. He engaged in rational inferences to reach the conclusion that there was a substantial possibility that Martinez was engaged in criminal conduct. He performed a *Terry* stop to "inquire exactly what was going on" and resolve the reasonable suspicion he formed. All of this was appropriate. The brief stop enabled Officer Garrison to

answer whether in fact wrongdoing was actually afoot. The totality of the circumstances adequately supports the conclusion that Officer Garrison had reasonable suspicion to perform the *Terry* stop.

**B.    *Neal***

**{39}**   The Court of Appeals' resolution of this case turned largely upon its interpretation of *Neal* and the Court's commitment to the proposition that *Neal* is both controlling and dispositive here. We disagree, and address *Neal* separately as it is distinguishable from the matter before us.

**{40}**   Unlike the present matter, *Neal* involved an initial, valid traffic stop. 2007-NMSC-043, ¶¶ 1, 22. The police saw Neal stop at a house that was under investigation for drug activity and speak with one of the residents. *Id.* ¶ 4. The officers monitoring the house formed the intention to stop Neal, saw that his windshield was broken, and after Neal drove away from the house stopped him for the windshield violation. *Id.* ¶ 5. The officer then sought to expand the stop based on suspicion that Neal might possess drugs. *Id.* ¶¶ 5, 9. The pivotal question in *Neal* was whether the officer could expand the stop. *Id.* ¶ 22. This question divided this Court.

**{41}**   The crux of the disagreement between the three-justice majority and the two-justice dissent was what evidence could be considered when evaluating whether reasonable suspicion existed to expand the stop. *Compare id.* ¶ 28 *with id.* ¶ 40 (Bosson, J., dissenting). The majority declined to consider three factors the dissent thought crucial: (1) after pulling Neal over for the windshield violation, the officer who performed the traffic stop recognized Neal as an individual with a criminal history involving drug transactions; (2) customary warrant checks identified Neal as a possibly armed and dangerous individual and another officer was sent to the scene of the stop; and (3) Neal informed the officer that the man he spoke with at the house was an individual the officer knew was a suspected drug dealer. *Id.* ¶ 40 (Bosson, J., dissenting).

**{42}**   The majority declined to consider this evidence and pointed to the proposition that "[o]fficers may not use a lawful stop to fish for evidence of other crimes where there is insufficient reason to detain a defendant, beyond the purpose of the initial detention." *Id.* ¶ 28 (internal quotation marks and citation omitted). The majority then went on to explain that there was, in fact, only the thinnest of permissible evidence to justify the expansion.

**{43}**   According to the majority, that evidence included only the following: Neal stopped in front of a house under investigation and spoke to another man, a felon; Neal was nervous during the stop; he wanted to leave; and he did not give the officer consent to search his vehicle. *Id.* The majority clarified, however, that the officer did not know who Neal was when Neal was seen in front of the drug house and did not know the identity of the man Neal spoke with at the house when the officer observed them conversing. *Id.* ¶ 30. The majority also explained that nervousness during a stop, a defendant's

desire to leave, and refusing to give consent to a search is not indicative of guilt. *Id.* ¶ 29. In the end, the only evidence available to the officer to expand the stop was, according to the majority, that someone stopped in front of a house under investigation. This was not enough, the majority held, to expand the stop. *Id.* ¶ 31.

**{44}** The present case is quite different from *Neal*. It does not involve either an initial traffic stop or the question of whether a traffic stop could be expanded into other matters. There is no concern about what evidence can or cannot be considered for resolution of the question presented: whether *all of the information* available to Officer Garrison was enough for a *Terry* stop to confirm or dispel suspicion of drug-related activity. Officer Garrison's suspicion that Martinez was engaged in drug sales was predicated on far more evidence than that which the majority in *Neal* thought permissible to assess the validity of the expansion of the stop in *Neal*.

### III.    CONCLUSION

**{45}** The Court of Appeals is reversed and the district court's order denying the suppression motion is affirmed.

**{46}    IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**