This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-41228

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**CANDICE NORTH,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Daylene Marsh, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Johnna L. Walker, Assistant Solicitor General
Albuquerque, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## MEMORANDUM OPINION

**MEDINA, Chief Judge.**

**{1}** The State appeals the district court's order granting Defendant Candice North's motion to suppress all evidence collected following a traffic stop and narcotics investigation. The State contends the district court did not consider all facts presented

when it ruled that the officer lacked reasonable suspicion to initiate the stop.[1] For the reasons set forth below, we reverse.

**BACKGROUND**

**{2}**     Defendant was charged with two counts of possession of a controlled substance, contrary to NMSA 1978, Section 30-31-23(A) (2021). Prior to trial, Defendant moved to suppress all evidence resulting from the traffic stop. As grounds in support of the motion to suppress, Defendant argued in part that the officer lacked reasonable suspicion to request a stop of the vehicle in which she was a passenger.

**{3}**     Testimony presented during the hearing on the motion to suppress revealed the following. An officer with the Farmington Police Department Region II Narcotics Task Force (Region II Narcotics Task Force) participated in a surveillance operation on a residence that was under investigation for drug activity. The officer had been a law enforcement officer since May 2016 and had observed over 100 drug transactions during his career in law enforcement.

**{4}**     Law enforcement received multiple tips about the residence from people who reported seeing activity that they thought was suspicious. In addition, the Region II Narcotics Task Force was aware that a person staying at the residence was known to deal in narcotics. However, the officer performing the surveillance on the residence was not personally aware of any convictions for drug related crimes resulting from investigatory stops of people leaving the residence.

**{5}**     The officer explained that when law enforcement conducts surveillance on a residence for narcotic activity, officers look for a pattern of coming and going activity. If the officers observe a pattern of coming and going activity, they will make an investigatory stop of people leaving the residence because coming and going activity is an indication that drug transactions are occurring at the residence.

**{6}**     Prior to Defendant's arrival at the residence, the officer observed three or four vehicles arrive during which individuals left their vehicles and entered the residence. The individuals remained in the residence for just a few minutes before returning to their vehicles and driving away. The officer described this type of activity as "coming and going traffic." This activity was similar to activity the officer observed taking place at this residence while conducting surveillance on a prior occasion.

**{7}**     The officer then observed a truck arrive and a woman, later identified as Defendant, get out of the passenger side of the truck and enter the residence. Defendant remained in the residence for three to five minutes before returning to the truck. The officer provided somewhat conflicting testimony regarding what transpired next. The officer testified that Defendant then reentered the truck and he observed a hand-to-hand exchange between Defendant and the driver. However, he later testified that he was not aware of what, if anything, the driver and Defendant exchanged in the

---

[1]We confine this opinion to the lawfulness of the stop.

truck. And finally, when the district court asked the officer, "Did you see [a] hand-to-hand [exchange] occur at that [residence] on that day?" the officer responded, "On that night, no, not to my recollection."

{8}     The officer then saw Defendant get out of the truck, enter the residence for a second time where she remained for another three to five minutes before returning and getting back into the passenger side of the truck. The driver of the truck then drove away. Based on his training and experience, the officer believed Defendant's conduct was consistent with drug activity, and suspected drug activity he had seen taking place at the residence by others on a prior occasion. The officer contacted another officer in a marked patrol unit that was on standby, and requested that the officer initiate a traffic stop of the truck and conduct a narcotics investigation. The officer explained that his decision to request a stop of the truck and conduct a narcotics investigation was based on: (1) the residence was known for dealing in narcotics; (2) the Region II Narcotics Task Force knew that the person staying in the residence was known for dealing in narcotics; and (3) the coming and going traffic the officer saw that night and during his prior surveillance of the residence. The stop resulted in the discovery of fentanyl inside Defendant's purse and methamphetamine in a compartment located in front of the passenger seat of the truck.

{9}     The district court entered an order granting Defendant's motion to suppress. The district court applied the three factors our Supreme Court considered in *State v. Martinez*, 2020-NMSC-005, ¶¶ 21, 28, 35, 457 P.3d 254, the officer's training and experience, permissible inferences versus hunches, and whether the location was a high crime area in analyzing whether the officer had reasonable suspicion to request a traffic stop and conduct a narcotics investigation.

## I.     The Officer's Training and Experience

{10}    With regard to this factor, the district court recognized that the officer was an agent with the Region II Narcotics Task Force and accorded credibility to the officer's testimony that, based on his experience, "hand[-]to[-]hand" exchanges and "coming and going traffic" were "indicative of narcotics activity."

## II.     Permissible Inferences Versus Hunches

{11}    As to this factor, the district court found in part that the officer (1) observed three or four instances of "coming and going" traffic prior to Defendant's arrival at the residence; (2) the officer witnessed coming and going traffic and hand-to-hand exchanges on a prior occasion at the residence; (3) the officer observed Defendant arrive at the residence, enter the residence, return to the vehicle she arrived in, interact with the driver of the vehicle, then reenter the residence for a short period of time before leaving the area; (4) the officer did not witness a "hand-to-hand exchange" on the date in question; and (5) "other than entering and exiting a [residence] that was under surveillance [the o]fficer . . . offered no articulable facts regarding . . . Defendant[']s actions" and that "[a]s with [*State v.*] *Neal*[, 2007-NMSC 043, 142 N.M. 176, 164 P.3d

57], the only articulable facts available to [the o]fficer . . . at the time he requested the stop of the vehicle Defendant was in was that the vehicle had stopped at a [residence] that he was investigating for narcotics activity."

### III.    Whether the Location Was a High Crime Area

**{12}**    Finally, with respect to whether the area was a high crime area, the district court made the factual finding that the Region II Narcotics Task Force had received anonymous tips regarding suspected narcotics activity at the residence involved in this case, but also observed that the officer was uncertain as to whether the area was a high crime area.

**{13}**    The district court found the facts in *Martinez* distinguishable from the facts in Defendant's case stating,

> In the instant case [the o]fficer . . . was unable to articulate what if anything . . . Defendant was engaged in. [The officer] did articulate that he was conducting a narcotics investigation on the [residence] under surveillance and given his surveillance he may have had reasonable suspicion as to the [residence]. However, other than entering and exiting a [residence] that was under surveillance, [the o]fficer . . . offered no articulable facts regarding . . . Defendant[']s actions.

**{14}**    This appeal followed.

### DISCUSSION

**{15}**    "Appellate review of a motion to suppress presents a mixed question of law and fact. We review factual determinations for substantial evidence and legal determinations de novo." *State v. Paananen*, 2015-NMSC-031, ¶ 10, 357 P.3d 958 (internal quotation marks and citation omitted). "Our review of a district court's determination of whether reasonable suspicion existed is de novo based on the totality of the circumstances." *State v. Leyva*, 2011-NMSC-009, ¶ 30, 149 N.M. 435, 250 P.3d 861. "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "[W]e review the facts in the light most favorable to the prevailing party, deferring to the district court's factual findings so long as substantial evidence exists to support those findings." *Neal*, 2007-NMSC-043, ¶ 15.

**{16}**    Article II, Section 10 of the New Mexico Constitution and the Fourth Amendment to the United States Constitution control the validity of investigative stops. *State v. Munoz*, 1998-NMCA-140, ¶ 8, 125 N.M. 765, 965 P.2d 349. A police officer "may make an investigatory stop in circumstances that do not rise to probable cause for an arrest if they have a reasonable suspicion that the law has been or is being violated." *State v. Flores*, 1996-NMCA-059, ¶ 7, 122 N.M. 84, 920 P.2d 1038 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). "Reasonable suspicion must be based on specific articulable

facts and the rational inferences that may be drawn from those facts." *Flores*, 1996-NMCA-059, ¶ 7. "Reasonable suspicion in New Mexico is analyzed with the use of an objective test." *State v. Hubble*, 2009-NMSC-014, ¶ 23, 146 N.M. 70, 206 P.3d 579. Therefore, "[t]he subjective belief of the officer does not in itself affect the validity of the stop; it is the evidence known to the officer that counts." *Munoz*, 1998-NMCA-140, ¶ 9. However, "[w]hen an officer relies upon training and experience to effectuate a stop, it is necessary that the officer explain why their knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." *Martinez*, 2020-NMSC-005, ¶ 22 (alternation, internal quotation marks, and citation omitted).

**{17}** Relying on *Martinez*, the State argues the district court's ruling on the motion to suppress was in error because the district court did not consider the officer's training, personal experience, and observations when it concluded that the officer lacked reasonable suspicion to believe Defendant was involved in criminal activity. *See* 2020-NMSC-005. Defendant responds that the facts of this case are more like those in *Neal*, and requests that we affirm the district court's ruling.

**{18}** Given the parties' and district court's focus on *Martinez* and *Neal*, we review those opinions before discussing their applicability to the facts here. In *Martinez*, the officer had twenty years of law enforcement experience and "significant training and experience in narcotics investigations." 2020-NMSC-005, ¶ 3. The officer conducted surveillance of a gas station where he had personal knowledge that drugs were frequently being purchased. *Id.* The officer had purchased drugs at that location approximately fifteen to twenty times while in an undercover capacity and had used a confidential informant to make approximately twenty to thirty additional drugs purchases at that location. *Id.* ¶¶ 3, 6.

**{19}** While conducting the surveillance at the gas station, the officer saw a vehicle drive up to a gas pump. *Id.* ¶ 4. The defendant then got out of the vehicle and while walking towards the convenience store, walked passed a large man. *Id.* Meanwhile the passenger got out of the vehicle, started the gas pump and then reentered the vehicle. *Id.* The large man walked to and entered the left rear side of the defendant's vehicle. *Id.* The large man interacted with the passenger for about two to three minutes before leaving the vehicle. *Id.* The defendant returned to the vehicle and drove to the side of the gas station parking lot. *Id.* ¶¶ 4, 5. The officer believed he had just witnessed a drug transaction. *Id.* ¶ 4.

**{20}** A few minutes later an SUV appeared and parked next to the defendant's vehicle. *Id.* ¶ 5. A woman got out of the SUV and entered the left rear of the defendant's vehicle where she stayed for a few minutes. *Id.* The woman then got out and reentered her SUV and drove away. *Id.* The officer believed he witnessed another drug transaction. *Id.* The officer initiated an investigatory stop of the defendant's vehicle because his observations were consistent with his experience and purchases that he made in vehicles while undercover. *Id.* ¶¶ 4-6. Methamphetamine, marijuana, a scale, cash, and other drug paraphernalia were discovered during the execution of a search warrant on the defendant's vehicle. *Id.* ¶ 9.

**{21}** The defendant argued that the officer lacked reasonable suspicion at the inception of the seizure and therefore the seizure was unlawful and any fruits of that seizure should be suppressed. *Id.* ¶ 10. In particular, the defendant argued that the officer's suspicion was nothing more than an inarticulate hunch that fell short of reasonable suspicion. *Id.* The district court denied the motion to suppress, and this Court reversed. *Id.* ¶ 12. Our Supreme Court accepted certiorari review and held that based on the totality of these circumstances, the officer had reasonable suspicion to perform an investigatory stop. *Id.* ¶ 38.

**{22}** With regard to officer training and experience, the Court reiterated that "courts must defer to the training and experience of the officer when determining whether particularized and objective indicia of criminal activity existed," *id.* ¶ 27 (internal quotation marks and citation omitted), and explained that training and experience provides officers with the unique capability of recognizing "the signatures of criminality, and by the same token, of not reading suspicion into perfectly innocent and natural acts." *Id.* ¶ 23 (alterations, internal quotation marks, and citation omitted). Additionally, when an officer "relies upon training and experience to effectuate a stop, it is necessary that the officer explain why their knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." *Id.* ¶ 22 (alteration, internal quotation marks, and citation omitted); *see also Terry,* 392 U.S. at 21 (stating that a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion").

**{23}** The Court observed that the evidence suggested the officer was conducting surveillance at the gas station "because there was a strong likelihood a drug transaction would be detected" and the officer's belief that a drug transaction was not based on speculation because the officer knew drugs had been bought and sold at the location before. *Martinez,* 2020-NMSC-005, ¶ 24. In addition, the Court concluded that the officer's belief that he had witnessed two drug transactions was not based on speculation, but was instead "grounded upon specific facts and rational inferences from those facts" because the officer "observed [the defendant] partake in two instances of exactly the kind of drug activity [the o]fficer . . . had previously observed at the [gas station]." *Id.* ¶ 25.

**{24}** With regard to the location of the stop, the Court instructed that "where an officer is patrolling an area known as a site where a particular crime is prevalent and stops an individual on suspicion that he or she has potentially committed the very crime that occurs with frequency in that area, then the assertion that the area in question is a high-crime area is . . . essential to understanding and judging the merits of the officer's suspicion." *Id.* ¶ 36. The Court concluded that the stop was justified in part because the officer's assertion that drugs were frequently purchased at the area of the stop was not based on a generic allegation. *Id.* ¶ 37. Rather the officer had firsthand knowledge of drug transactions occurring at the gas station.

**{25}** In *Neal,* an officer observed a vehicle in front of a house that was under investigation for drug activity and in which several individuals with criminal backgrounds

were known to live or frequent the house. 2007-NMSC-043, ¶ 4. The officer observed an individual interacting with the driver of a truck through the driver side window. *Id.* Although the officer could not see the hands of the individual or the driver, or hear their conversation, he believed he had observed a drug transaction. *Id.* ¶ 5. The driver of the truck drove away as the officer approached the truck. *Id.* The officer decided to follow the vehicle and stopped the truck for a broken windshield. *Id.*

**{26}**   Upon approaching the truck, the officer recognized the driver as an individual whom he knew had prior drug-related convictions. *Id.* The officer asked the driver whom he was speaking to earlier at the house and learned that it was a person he recognized as living or frequenting the house and that the person had a criminal background. *Id.* ¶¶ 4, 7. The officer asked the driver for consent to search the truck, which the driver denied. *Id.* ¶ 1. The officer detained the truck pending the arrival of a canine officer to perform a perimeter sniff of the truck because he believed he had reasonable suspicion that the driver had engaged in a drug transaction. *Id.* During a subsequent search of the truck, officers discovered methamphetamine. *Id.* ¶ 11. The driver of the truck moved to suppress the evidence discovered after the stop. *Id.* ¶ 2.

**{27}**   In assessing whether the officer had reasonable suspicion that drugs would be found in the truck, our Supreme Court reiterated that reasonable suspicion "is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken the law." *Id.* ¶ 21 (emphasis, internal quotation marks, and citation omitted). The Court recognized that while "officers may draw on their own experience and specialized training to make inferences" this "does not mean that unsupported intuition and inarticulate hunches are sufficient to constitute reasonable suspicion." *Id.* (alteration, omission, internal quotation marks, and citations omitted).

**{28}**   The Court then observed that the defendant never entered the house and that the officer only saw "an occupant of the house . . . leaning into [the d]efendant's [vehicle but] could not see what, if anything, they were doing, aside from talking, and could not hear what they were saying" and that the defendant had not entered the house under investigation. *Id.* ¶ 27. The Court held that the facts did not "constitute the type of individualized, specific, articulable circumstances necessary to create reasonable suspicion that [the d]efendant . . . was involved in criminal activity." *Id.* ¶ 31.

**{29}**   As there was no dispute that the initial stop of the vehicle for a cracked windshield was valid, the Court held that the officer did not have particularized information with respect to the driver to constitute reasonable suspicion that drugs would be found in the truck and thereby justify the detention of the truck beyond the time necessary to issue a citation. *Id.* ¶ 23. In reaching this holding, our Supreme Court relied in part on this Court's prior opinion in *State v. Prince*, 2004-NMCA-127, ¶ 2, 136 N.M. 521, 101 P.3d 332, and concluded that the "[d]efendant's mere association with a convicted felon . . . who was under surveillance in an ongoing drug investigation, was insufficient to create reasonable suspicion of [the d]efendant." *Id.* ¶¶ 24, 25, 30.

**{30}**  In the present case, the State contends that, like the officer in *Martinez*, the officer's testimony regarding his training and experience in narcotics investigations supported his reasonable suspicion to believe Defendant was engaged in criminal activity. We commence by observing that the district court credited the officer's testimony regarding his membership of the Region II Narcotics Task Force and observed that the officer's training and experience did not appear to be at issue. In addition, the district court credited the officer's testimony that, based on his training and experience, his prior observations of "coming and going" traffic at the residence was indicative of narcotics activity and that the officer had previously observed hand-to-hand activity; that on the evening in question, the officer observed an additional three to four instances of vehicles coming and going.

**{31}**  Unlike the facts in *Neal*, where the officer simply articulated a belief and a description of the defendant's behavior outside a residence, here the officer explained that based on his training and experience, why his specific observation of Defendant arriving at a residence under surveillance for drug activity, entering the residence twice for short periods of time, interacting with the driver in the truck, and then driving away, was indicative of drug activity. Based on these facts we conclude that the officer's belief that Defendant had engaged in drug activity was based on more than mere association with a residence suspected of engaging in drug activity and more than just a hunch. *See Martinez*, 2020-NMSC-005, ¶ 27 (stating that the "courts must defer to the training and experience of the officer when determining whether particularized and objective indicia of criminal activity existed" (internal quotation marks and citation omitted)).

**{32}**  In addition, while the officer here had not participated in undercover drug transactions at the residence, or used a confidential informant to make a drug purchase at the residence as the officer had in *Martinez*, the evidence here suggests that the officer anticipated seeing evidence of drug transactions occurring because on the night in question the officer (1) was aware that an individual staying at the residence was known by the Region II Narcotics Task Force to "deal narcotics"; (2) had seen coming and going traffic and a hand-to-hand exchange at the residence on a prior occasion; and (3) law enforcement had received multiple tips from civilians who witnessed suspicious activity taking place at the residence.[2]

**{33}**  Based on the totality of these circumstances, we accept Defendant's concession in her answer brief and during oral argument that reasonable suspicion of drug transactions taking place at the residence had been developed. Therefore, when the officer observed Defendant arrive at the residence and twice enter the residence for a short period of time after interacting with the driver in the truck, prior to driving away, in

---

[2]With regard to the anonymous tips, we asked the State during oral argument to identify a case that would permit this Court to rely on the anonymous tips, which lacked detail and failed to describe what type of activity was being observed; however, the State was unable to provide this Court with supporting authority. We therefore give the tips no weight because the State did not develop any argument or cite any authority to the contrary. *See State v. Urioste*, 2002-NMSC-023, ¶ 12, 132 N.M. 592, 52 P.3d 964 (stating that "anonymous tips are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability" (internal quotation marks and citation omitted)).

addition to other incidents of coming and going traffic, the officer's suspicion that Defendant had engaged in a drug transaction was based on more than just a hunch. Rather, the officer's reasonable suspicion was based on his observations and knowledge, which the district court gave credit to.

**{34}**    To the extent the State asks this Court to consider the officer's testimony that he saw Defendant engage in a hand-to-hand exchange with the driver of the truck, we decline to do so. The district court clearly resolved the officer's conflicting testimony on this subject by giving credit to his testimony that he did not observe a hand-to-hand exchange on the night in question, and only observed Defendant "interact with the driver of the vehicle" after she exited the residence the first time and before she entered the residence the second time. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that it is for the fact-finder to resolve any conflicts in the testimony of witnesses and to determine which testimony it finds credible); *see also State v. Yazzi*, 2019-NMSC-008, ¶ 24, 437 P.3d 182 (reiterating that "we consider whether the district court's factual findings were supported by substantial evidence"). Thus, the analysis of the facts and whether they support a finding of reasonable suspicion does not include evidence of Defendant engaging in a "hand-to-hand" transaction with the driver of the truck. We do, however, rely on the officer's testimony that he observed Defendant interact with the driver prior to reinterring the residence.

**{35}**    Finally, we address the supplemental authority Defendant provided to this Court for our consideration, *see State v. Griggs*, No. 30,533, mem. op. (N.M. Ct. App. Sep. 28, 2020) (nonprecedential). In *Griggs*, two officers working narcotics patrol observed a van pull up to a known drug house. *Id.* ¶ 1. An individual left the van and entered the house and then promptly returned to the van. *Id.* The officers followed the van and stopped it for making a turn without signaling and for cutting off traffic. *Id.* One of the officers questioned the driver, inquiring why the passenger had entered the house. *Id.* The driver responded that the passenger was visiting his friend. *Id.* The officer then asked the passenger where they were coming from and the passenger stated he was visiting his sister's boyfriend. *Id.*

**{36}**    Viewing the statements of the driver and passenger as inconsistent, the officer explained his suspicions and asked the passenger if he had crack cocaine on his person to which the passenger responded that he did not. *Id.* The passenger consented to the search of his person and the officer found crack cocaine in the passenger's pocket. *Id.* The officer testified that he did not know the passenger, did not see the passenger commit a crime, and knew nothing of the passenger's criminal history. *Id.*

**{37}**    This Court concluded that, as in *Neal*, the officer's suspicions were based on conjecture and hunches, which were insufficient to constitute reasonable suspicion. *Id.* ¶ 2. This Court rejected the state's argument that the passenger entering a known drug house was sufficient to constitute reasonable suspicion because "'guilt by association and generalized suspicions are insufficient grounds upon which to base an investigatory detention.'" *Id.* ¶ 3 (quoting *Prince*, 2004-NMCA-127, ¶ 17). The facts in the case at bar are distinguishable from those in *Griggs* because the officer here provided testimony

explaining why his training and experience led him to suspect that Defendant's acts of entering the residence twice for short periods of time after interacting with the driver in the truck, prior to leaving the area, led him to believe Defendant had engaged in a drug transaction. *See Martinez*, 2020-NMSC-005, ¶ 23 (recognizing that training and experience provides officers with the unique capability of recognizing "signatures of criminality, and by the same token, of not reading suspicion into perfectly innocent and natural acts" (internal quotation marks and cited authority omitted)). Therefore, we find Defendant's reliance on *Griggs* unavailing.

**CONCLUSION**

**{38}**   Based on the foregoing reasons, we reverse the district court's order suppressing the evidence.

**{39}   IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Chief Judge**

**WE CONCUR:**

**ZACHARY A. IVES, Judge**

**SHAMMARA H. HENDERSON, Judge**